[15 NE3d 287, 991 NYS2d 532]

In the Matter of STATE OF NEW YORK, Respondent, v JOHN S., Appellant.

Argued March 27, 2014; decided May 8, 2014

POINTS OF COUNSEL

*Marvin Bernstein, Mental Hygiene Legal Service*, New York City (*Deborah P. Mantell* and *Sadie Z. Ishee* of counsel), for appellant. I. Records from the 1968 dismissed and sealed cases, as well as the uncharged 1978 accusation, should not have been available to the State or the psychiatric examiners, where those cases were null and void as a matter of law. (*Matter of Miguel M. [Barron]*, 17 NY3d 37; *Lino v City of New York*, 101 AD3d 552; *Matter of Harper v Angiolillo*, 89 NY2d 761; *Matter of Katherine B. v Cataldo*, 5 NY3d 196; *Matter of Alonzo M. v New York City Dept. of Probation*, 72 NY2d 662; *Doctors Council v New York City Employees' Retirement Sys.*, 71 NY2d 669; *People v Weaver*, 12 NY3d 433; *Matter of Joseph M. [New York City Bd. of Educ.]*, 82 NY2d 128; *Matter of Dondi*, 63 NY2d 331; *People v Finnegan*, 85 NY2d 53.) II. The State's expert's reliance on the unproven 1968 and 1978 accusations violated due process; the trial court's rulings were contrary to both New York state and federal rules of evidence concerning the introduction of inadmissible information on which an expert's opinion is based. (*Kansas v Hendricks*, 521 US 346; *Specht v Patterson*, 386 US 605; *Matter of von Wiegen*, 63 NY2d 163; *People v Goldstein*, 6 NY3d 119; *United States v James*, 712 F3d 79; *Tennessee v Street*, 471 US 409; *Willner v Committee on Character & Fitness, Appellate Div. of Supreme Court of N.Y., First Judicial Dept.*, 373 US 96; *Mathews v Eldridge*, 424 US 319; *Vitek v Jones*, 445 US 480; *People v Pringle*, 71 AD3d 1450.) III. Where the State's case relied on its experts' diagnosis of antisocial personality disorder and John S. has not engaged in any sexual or aggressive conduct since 1996, the evidence was insufficient as a matter of law to satisfy statutory and due process requirements for a finding of a mental abnormality. (*Humphrey v Cady*, 405 US 504; *Matter of State of New York v Shannon S.*, 20 NY3d 99; *Kansas v Crane*, 534 US 407; *Tucker v Ozmint*, 350 F3d 433; *United States v Wilkinson*, 646 F Supp 2d 194; *United States v Graham*, 683 F Supp 2d 129; *United States v Francis*, 686 F3d 265; *Foucha v Louisiana*, 504 US 71.)

*Eric T. Schneiderman, Attorney General*, New York City (*Andrew W. Amend, Barbara D. Underwood* and *Steven C. Wu* of counsel), for respondent. I. Supreme Court correctly unsealed records concerning John S.'s 1968 crimes. (*People v Mingo*, 12 NY3d 563; *Matter of Melendez v Wing*, 8 NY3d 598; *Matter of State of New York v Floyd Y.*, 22 NY3d 95; *Matter of State of New York v Mark S.*, 87 AD3d 73; *Matter of State of New York v*

*Shawn X.*, 69 AD3d 165; *Matter of Rodriguez v Perales*, 86 NY2d 361; *Matter of Smathers*, 309 NY 487; *Matter of Harper v Angiolillo*, 89 NY2d 761; *Matter of Dondi*, 63 NY2d 331; *Matter of Joseph M. [New York City Bd. of Educ.]*, 82 NY2d 128.) II. Supreme Court correctly allowed the State's experts to relate the bases of their opinions to the jury. (*People v Aska*, 91 NY2d 979; *People v Goldstein*, 6 NY3d 119; *People v Rodriguez*, 284 AD2d 952; *People v Beam*, 57 NY2d 241; *United States v Leeson*, 453 F3d 631.) III. John S.'s challenge to his antisocial personality disorder diagnosis offers no basis to reverse the jury's verdict. (*Matter of State of New York v Shannon S.*, 20 NY3d 99; *Drake v Portuondo*, 321 F3d 338; *Matter of State of New York v Andrew O.*, 16 NY3d 841; *Matter of George L.*, 85 NY2d 295; *Adamy v Ziriakus*, 92 NY2d 396; *Kansas v Crane*, 534 US 407; *Jones v United States*, 463 US 354; *Morales v County of Nassau*, 94 NY2d 218; *Kansas v Hendricks*, 521 US 346; *United States v Caporale*, 701 F3d 128.)

### OPINION OF THE COURT

Abdus-Salaam, J.

We recently held in *Matter of State of New York v Floyd Y.* (22 NY3d 95 [2013]) that hearsay basis testimony by an expert witness may be admitted at a Mental Hygiene Law article 10 trial if the hearsay is reliable and its probative value in assisting the jury to evaluate the expert's opinion substantially outweighs its prejudicial effect. The main issue on this appeal is whether hearsay basis testimony about respondent John S.'s sex offenses that did not lead to valid adjudications of guilt satisfied this standard and, if not, whether admission of the hearsay requires reversal. We hold that basis hearsay related to respondent's indictments for rape and robbery met the minimum due process requirements we outlined in *Floyd Y.* and was properly admitted at trial. We further conclude that, although basis hearsay about an uncharged rape was unreliable and should have been excluded, its admission was harmless error.

### I.

In September 1968, respondent pleaded guilty to rape in the first degree (Penal Law § 130.35) and robbery in the first degree (Penal Law § 160.15) in satisfaction of multiple charges arising from a series of attacks on women committed around City College in Manhattan. The charges, set out in two indictments, alleged that over a span of 32 days, respondent raped and robbed three different victims, and that he robbed two additional

victims. In all of these cases respondent allegedly threatened the victims with a weapon and forced them to accompany him. Two of the victims were raped on roof landings near the City College subway stop, and two victims were sodomized in addition to being raped. All the crimes allegedly took place between approximately 11 a.m. and 9 p.m. within the vicinity of City College.

After accepting respondent's plea of guilty, Supreme Court ordered that, based on statements respondent made during the plea colloquy, he be committed to undergo psychiatric examination. Respondent was thereafter diagnosed as suffering from paranoid schizophrenia. In November 1968, respondent was found incompetent to stand trial and committed to the custody of the Commissioner of Mental Hygiene. Five months later, however, respondent was certified as competent based on reports the court received from the hospital where he was being treated. Respondent was sentenced to 5 to 15 years in prison based on his September 1968 guilty plea.[1]

After unsuccessfully challenging his convictions in state court, respondent filed a habeas corpus petition in the United States District Court for the Southern District of New York. That court vacated respondent's convictions and granted a writ to issue within 60 days unless respondent was permitted to replead to the indictments in Supreme Court (see United States ex rel. Suggs v LaVallee, 430 F Supp 877, 884 [SD NY 1977]). The District Court determined that the convictions were invalid because respondent was incompetent when he pleaded guilty in September 1968 and Supreme Court never afforded him an adequate colloquy regarding the voluntariness of his plea (see id.). The Second Circuit affirmed (Suggs v LaVallee, 570 F2d 1092, 1119 [2d Cir 1978], cert denied 439 US 915 [1978]), and respondent was released on parole in August 1978.

For reasons not clear from the record, the New York County District Attorney's Office did not re-prosecute respondent under the 1968 indictments and the case was officially closed sometime

---

1. The sentencing minutes indicate that, prior to sentencing, respondent's counsel had made an application to withdraw respondent's guilty plea, but that counsel later withdrew that application at respondent's request. Counsel stated during colloquy that respondent "is not changing his plea. He simply wants to explain what happened." Respondent additionally stated, in response to questions from the court, that he understood that he was no longer attempting to withdraw his plea and that he "wish[ed] to be sentenced today."

in late 1978 or early 1979. Records pertaining to these indictments were sealed pursuant to CPL 160.50, which mandates the sealing of official records relating to criminal proceedings that terminate in favor of the accused.

Meanwhile, 19 days after respondent was released on parole, he committed a violent rape. On September 16, 1978, respondent threatened a woman with a gun and forced her into Washington Square Park, where he robbed her, struck her, and strangled her until she lost consciousness. Respondent then forced the victim to Pier 48 on the Hudson River, dragged her up a flight of stairs by her hair, again struck and strangled her, and raped her. Respondent was convicted after trial of rape in the first degree and sentenced to an indeterminate term of 74 months to 20 years' imprisonment.

While serving his sentence for the 1978 rape conviction, respondent committed several instances of misconduct that resulted in both criminal and disciplinary charges. In 1987, he was indicted for arson in the second degree (Penal Law § 150.15) for intentionally starting a fire on his prison cell bed in the presence of a correction officer. He was found guilty of criminal mischief in the fourth degree (Penal Law § 145.00) and received a 10-month sentence to run concurrently with his current sentence for first-degree rape. Two years later, respondent received disciplinary penalties for assaulting a female correction officer by attempting to force her into a broom closet. Respondent was later released on parole in 1992.

Respondent remained at liberty in the community for four years before committing another rape, again while under parole supervision. On August 4, 1996, respondent raped a college student in Central Park. At that time, he was 45 years old and had a wife and a seven-month-old daughter. Respondent pleaded guilty to rape in the first degree by forcible compulsion (Penal Law § 130.35 [1]) and was sentenced to 12½ years in prison.

Prior to respondent's release from custody, the Attorney General, on behalf of the State of New York (the State), filed a petition under article 10 seeking a determination that respondent is a detained sex offender requiring civil management. The petition included a written evaluation report prepared by Dr. Trica Peterson, a licensed psychologist and psychiatric examiner employed by the New York State Office of Mental Health (OMH) (see Mental Hygiene Law § 10.06 [d]). As a result of her personal examination of respondent and her review of available records

describing his background and criminal history,[2] Dr. Peterson concluded in her report that respondent currently suffers from antisocial personality disorder. Dr. Peterson opined that this condition constitutes a "mental abnormality" that predisposes respondent to the commission of sexual offenses and makes it difficult for him to control such behavior (see Mental Hygiene Law § 10.03 [i]).

In preparation for trial, the State moved for a court order unsealing the records related to respondent's 1968 indictments for rape and robbery. The State premised its motion on Mental Hygiene Law § 10.08 (c), which provides that, "[n]otwithstanding any other provision of law," the Attorney General is entitled to request, and the appropriate entity is authorized to provide,

> "any and all records and reports relating to the respondent's commission or alleged commission of a sex offense, the institutional adjustment and any treatment received by such respondent, and any medical, clinical or other information relevant to a determination of whether the respondent is a sex offender requiring civil management."

Supreme Court granted the motion and ordered the records unsealed.

Respondent thereafter moved in limine to preclude expert testimony relating to the 1968 charges. Respondent argued that he "must be presumed innocent" of the charged offenses because a federal court vacated his convictions and the indictments were subsequently dismissed and sealed. He also contended that the unsealed records contained inadmissible hearsay information that was not sufficiently reliable to form the basis of an expert opinion and that, if admitted at trial, would prejudice his case.

At oral argument on the motion, respondent also sought to preclude the State's experts from testifying about an uncharged rape respondent allegedly committed seven days after the

---

2. According to Dr. Peterson's report, these records included: OMH documents, respondent's rap sheet, New York State Division of Criminal Justice Services sex offender registry information; New York County Supreme Court records related to respondent's 1978 and 1996 rape convictions; a presentence report prepared by the probation department following respondent's 1978 conviction; New York State Division of Parole records; and Department of Corrections and Community Supervision records detailing, among other things, respondent's disciplinary history and failure to participate in sex offender treatment while incarcerated.

incident underlying his 1978 rape conviction. A presentence report prepared in connection with that conviction (hereinafter, 1979 presentence report), which was summarized in Dr. Peterson's evaluation report, alleges that on September 23, 1978, respondent abducted a woman from Washington Square Park and forced her onto the same Hudson River pier, where he raped and robbed her. According to the 1979 presentence report, respondent gave the victim his phone number, which she turned over to the police after reporting the crime. The 1979 presentence report indicates respondent was later arrested for both the September 16th rape and the September 23rd rape, but the District Attorney declined to indict him for the latter offense because that victim was too "upset" to proceed with the prosecution.

Supreme Court held a hearing on respondent's motion, where the parties' expert witnesses discussed the materials they relied upon in forming their opinions. The State presented testimony from a different expert, Dr. Stuart M. Kirschner, and respondent presented testimony from Dr. Joseph J. Plaud. Both witnesses testified that, in preparing their respective evaluations of respondent, they reviewed the official documents referenced in Dr. Peterson's evaluation report, as well as unsealed records related to the 1968 charges, which included the two indictments, a presentence investigation report prepared by the New York City Department of Probation, New York County Supreme Court records, police reports, and victims' statements, among other documents. The experts also agreed that mental health professionals who evaluate article 10 respondents commonly rely on these types of records, even if the records describe sex offenses that did not result in criminal convictions.

After the hearing, Supreme Court, stating that it had applied Federal Rule of Evidence (FRE) 703 to determine the extent to which hearsay basis testimony could be presented at trial, ruled that the experts could testify that they relied on the 1968 charges in forming their opinions and that they could relay the facts underlying the indictments. The court explained that, in its view, the charges bore "very significant indicia of reliability" in light of "[t]he fact that a Grand Jury . . . found reasonable cause to believe that the respondent committed" the five incidents underlying the indictments, "as well as the fact that the[re] were complaints, arrests, police records and, later, guilty pleas from the respondent." The court further concluded that a

description of the underlying facts, although potentially prejudicial to respondent, was critical to assist the jury in understanding the basis of the experts' opinions. The court noted, however, that respondent was "never validly convicted" under the indictments and, in an effort to prevent the jury from speculating that his guilty plea was invalidated on "some kind of technicality," it precluded the experts from testifying about the vacated convictions. The court also precluded the experts from disclosing to the jury potentially inflammatory details revealed in unsealed records, including references to respondent as "the City College rapist."[3]

The court further ruled that the experts were permitted to testify that respondent was arrested for the uncharged 1978 rape and to provide "a brief recitation of the underlying facts." The court concluded that there was "reliable information" indicating that respondent committed that crime, and that the factual similarities and overlap between his two 1978 offenses created independent indicia of reliability. The court ruled, however, that it would not "allow information about why the second [1978 rape] was not prosecuted" because telling the jury that "the victim was too traumatized to testify" would be "more prejudicial than probative."

At trial, the State presented testimony from two lay witnesses—Richard Elwyn and Richard Vlack—and its two expert witnesses—Dr. Peterson and Dr. Kirschner. Mr. Elwyn, a retired New York State parole officer, testified that in the mid-1970s respondent told him that he committed a rape in 1968. Mr. Vlack, also a parole officer, testified that during a 2007 interview respondent asserted that his intercourse with the 1996 rape victim was consensual. Mr. Vlack also stated that respondent did not participate in sex offender treatment while confined for this offense.

Dr. Peterson testified that, in concluding that respondent suffers from a mental abnormality, she relied upon her examination of respondent and numerous records describing his juvenile, psychiatric, criminal, and disciplinary history. Specifically, Dr. Peterson testified that she considered records describing, among other things, respondent's 1968 indictments for rape and robbery of "college-aged women around City College"; an

---

**3.** The trial court also held that the State's experts could not testify about two parole reports from the mid-1970s that stated that respondent had admitted his guilt to one of the 1968 rapes because that hearsay lacked "significant indicia of reliability" and was "more prejudicial than probative."

arrest for two rapes in 1978 shortly after being released on parole; a 1989 "disciplinary ticket" for "attempting to drag [a] female Correctional Officer into a broom closet"; and a 1996 conviction for rape. Dr. Peterson identified similarities between some of these offenses, noting that many of the victims were college aged and had reported being threatened by a weapon, and that the 1996 rape, the first 1978 rape, and "purportedly" the uncharged rape had begun in a park or public area. Dr. Peterson stated that, during her examination, respondent denied culpability for several offenses; particularly, he denied that he raped the 1996 victim and claimed that he had been having a consensual sexual relationship with the correction officer he was charged with assaulting in 1989. Respondent also told Dr. Peterson that both 1978 victims had sold drugs for him in the park and falsely accused him of rape after he had the first victim "beat up" for stealing drugs from him.

Concerning her mental abnormality diagnosis, Dr. Peterson reiterated her prior conclusion that respondent met the diagnostic criteria for antisocial personality disorder as defined in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM). The DSM requires, among other factors, at least three of the following seven traits to reach an antisocial personality disorder diagnosis: failure to conform to social norms and laws, impulsivity, aggressiveness, disregard for the safety of self or others, lack of remorse, deceitfulness, and irresponsibility. Dr. Peterson diagnosed respondent with the first five of these traits. She explained that respondent's offending history demonstrated impulsivity and lack of control in light of the public location of his offenses and his "quick return to offending" in 1978 and 1996 after being released on parole. The violent nature of the first 1978 rape—which involved "strangling to unconsciousness," "dragging the victim," and "kicking her"—reflected respondent's aggressiveness, in Dr. Peterson's view, as did respondent's statement, made during his examination, that he once broke someone's arm over a game of pool. Dr. Peterson also testified that respondent's repeated denials of guilt and minimization of certain offenses by insisting that they were consensual demonstrated he lacked remorse.

Dr. Peterson acknowledged that antisocial personality disorder is not invariably linked to sex offending, but she stated that in respondent's case, the disorder manifests in a predisposition to commit sex offenses and difficulty controlling that predisposition. In Dr. Peterson's view, respondent's disorder impacts his

"sense of entitlement"—that is, his belief that "[he] can take what. [he] want[s], even if what [he] want[s] is sexual, even if the person is not consenting"—and causes him to "act[ ] on his thoughts or his urges" without remorse or regard for the rights of others. Dr. Peterson opined that most sex offenders do not reoffend and that respondent's long and distinctive history of assaulting multiple victims "demonstrates a predilection for sex offending." In addition, she found signs of respondent's difficulty controlling his behavior in his "historical pattern" of "reoffending after being sanctioned for committing another sex offense," his refusal to participate in sex offender treatment, and his indication during her examination that "his wife stopped having sex with him in 1996," which "ultimately . . . resulted in a rape of another individual."

Dr. Kirschner similarly diagnosed respondent as suffering from antisocial personality disorder based on his review of respondent's criminal and mental health records.[4] Dr. Kirschner diagnosed respondent with all seven traits of antisocial personality disorder outlined in the DSM. He agreed with Dr. Peterson that respondent lacks remorse for his offenses, is aggressive and impulsive, disregards the safety and rights of others, and is unable to conform his behavior to the law. Dr. Kirschner identified these antisocial traits in respondent's commission of the 1968 offenses in public places during normal hours; his commission of the first 1978 rape in broad daylight and within 19 days of returning to the community; and his disciplinary infractions involving his assault of the female correction officer and starting a fire in his cell.[5]

Additionally, Dr. Kirschner opined that respondent's antisocial traits "are linked to his sexual deviancy" and that there was no evidence respondent had meaningfully addressed that deviancy. Dr. Kirschner testified that respondent's refusal to participate in sex offender programs while incarcerated and his lack of progress in treatment since being confined under article 10 demonstrate his persistence in "deviant thinking" and, in Dr. Kirschner's view, the reality that respondent is "[no] different

---

4. Dr. Kirschner testified that respondent "[refused to] consent to an interview with [him]."

5. During Dr. Kirschner's testimony, the court instructed the jury that respondent was arrested and indicted for the 1968 offenses "but was not convicted." The court also stated that respondent "was incarcerated between 1968 and 1978, and the reason for that incarceration is not evidence that is before you, so it is not something that you should consider."

now than he was when he was a teenager." Consistent with this assessment, Dr. Kirschner testified that respondent's commission of a rape in 1996—at 45 years old and despite having a wife and child—demonstrated his continued lack of control. Dr. Kirschner also stated that there was no research indicating that a person will stop reoffending once he or she reaches a certain age, and he disputed the notion that growing older reduces the chances that a sex offender will recidivate.

Dr. Plaud concluded based on his interview of respondent and his review of the pertinent records that respondent did not suffer from a mental abnormality within the meaning of article 10.[6] Dr. Plaud acknowledged that respondent fit the criteria for antisocial personality disorder; specifically, that he met six of the seven behavioral traits listed in the DSM. In Dr. Plaud's view, however, antisocial personality disorder "is wholly insufficient to substantiate a linkage between the psychiatric disorder and future sexual offense," and respondent does not meet the criteria for a sexually-based disorder, such as paraphilia not-otherwise-specified or sadism. Dr. Plaud also disagreed with the State's experts that respondent's denial or minimization of his guilt indicates an increased risk of reoffending; rather, Dr. Plaud asserted that respondent is not likely to reoffend because he was now 59 years old and research has demonstrated a decline in the recidivism of sex offenders as they age.

The court instructed the jury, both initially and in its final charge, that accounts of respondent's conduct from out-of-court records were not to be considered for their truth, but rather, to allow the jury to evaluate the bases of the experts' opinions. The jury returned a verdict finding that respondent suffers from a mental abnormality qualifying him for civil management under article 10. Following a further dispositional hearing, Supreme Court found that respondent is a dangerous sex offender in need of confinement and ordered him committed to a secure treatment facility operated by OMH (32 Misc 3d 1206[A], 2011 NY Slip Op 51195[U] [2011]). Respondent appealed.

The Appellate Division unanimously affirmed (*Matter of State of New York v John S.*, 104 AD3d 511 [1st Dept 2013]). The

---

**6.** During his testimony, Dr. Plaud explained that respondent neither admitted nor denied the 1968 charges, but simply had no memory of the pertinent time period. With respect to the 1978 incidents, Dr. Plaud indicated that respondent relayed the same account that he gave Dr. Peterson: that both of the 1978 victims had falsely accused him of rape following his having arranged to have one of them physically assaulted for stealing drugs from him.

court held that the records related to the 1968 charges were properly unsealed pursuant to Mental Hygiene Law § 10.08 (c), which "supersedes CPL 160.50" (*id.* at 511). The Appellate Division additionally found "no basis for disturbing the [trial] court's determination that the disclosed hearsay facts' probative value to the jury in evaluating the experts' opinions substantially outweighed their prejudicial effect" (*id.* at 512). Finally, the court held that the evidence of mental abnormality was sufficient to support the jury's verdict (*see id.*).

Respondent appealed to this Court as of right pursuant to CPLR 5601 (b) (1).

## II.

### A.

Respondent argues, as a threshold matter, that it was error for Supreme Court to unseal the records about the 1968 charges and allow them to be disclosed to the State. While acknowledging that Mental Hygiene Law § 10.08 (c) grants the State broad access to records "[n]otwithstanding any other provision of law," respondent contends that this statute does not supersede CPL 160.50, which provides that "[u]pon the termination of a criminal action or proceeding against a person in favor of such person . . . the record of such action or proceeding shall be sealed" (CPL 160.50 [1]) and all official records "on file with the division of criminal justice services, any court, police agency, or prosecutor's office" must not be made available "to any person or public or private agency" (*id.* at [1] [c]).

"It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature. The starting point is always to look to the language itself and where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning" (*State of New York v Patricia II.*, 6 NY3d 160, 162 [2006] [internal quotation marks, alterations, and citations omitted]; *see* McKinney's Cons Laws of NY, Book 1, Statutes § 76). Mental Hygiene Law § 10.08 (c) contemplates broad disclosure of "any and all records and reports relating to the respondent's commission or *alleged commission* of a sex offense," as well as "any medical, clinical or other information relevant to a determination of whether the respondent is a sex offender requiring civil management" (emphasis added). Critically, the statute authorizes disclosure "[n]otwithstanding any other provision of law" that might otherwise prohibit it (*id.*).

■ The meaning of the statute's "notwithstanding" clause is plainly understood and " 'clearly supersedes *any* inconsistent provisions of state law,' " including the sealing procedures set forth in CPL 160.50 (*Matter of State of New York v Zimmer*, 63 AD3d 1563, 1563-1564 [4th Dept 2009], quoting *Matter of Melendez v Wing*, 8 NY3d 598, 609 [2007]). Although CPL 160.50 was not among the statutes the legislature amended to explicitly allow the State access to records in article 10 proceedings (*see e.g.* CPL 720.35 [4] [unsealing of records regarding a youthful offender adjudication]; CPL 390.50 [3] [permitting access to presentence investigation reports from the instant offense underlying the article 10 petition]), we believe that the legislature's inclusion of the "notwithstanding" clause in Mental Hygiene Law § 10.08 (c) was deliberate and was intended to authorize disclosure of information that other statutes, like CPL 160.50, would not otherwise permit (*see generally Matter of Hernandez v Barrios-Paoli*, 93 NY2d 781, 788 [1999]; *Eaton v New York City Conciliation & Appeals Bd.*, 56 NY2d 340, 346 [1982]).

The records Supreme Court unsealed here—indictments, presentence reports, police reports, and victim's statements, among other documents in the possession of official entities[7]—are the types of records the legislature contemplated the State would have access to in an article 10 proceeding (*see* Mental Hygiene Law § 10.08 [c]). Respondent pleaded guilty in satisfaction of the 1968 indictments charging him with committing a string of rapes and robberies. Although his conviction was later vacated on mental incompetency grounds, the fact remains that respondent was charged and indicted for those crimes; that is, he was *alleged* to have committed them. Mental Hygiene Law § 10.08 (c), by authorizing disclosure of records relating to the "alleged commission of a sex offense," necessarily contemplates the release of records, such as these, which document sex offenses that did not result in valid adjudications of guilt. The 1968 records also qualify for disclosure under the statute's catch-all provision because they contain "information relevant to a

7. The State originally sought to unseal records in the possession of the New York County District Attorney's Office, the New York City Police Department (NYPD), and the New York County Clerk. However, the State later submitted an affirmation stating that the District Attorney's files related to the indictments had been "accidentally destroyed" and the NYPD records had never been sealed under CPL 160.50. Thus, it appears that the only records unsealed were those maintained by the New York County Clerk.

determination" of whether respondent requires civil management under article 10 (Mental Hygiene Law § 10.08 [c]).

Respondent further argues that CPL 160.60 should have barred disclosure of the sealed records. That statute provides, in pertinent part, that once a criminal action or proceeding has terminated in favor of the accused, "the arrest and prosecution shall be deemed a nullity," and the information about that arrest or prosecution may not be disclosed *"[e]xcept where specifically required or permitted by statute or upon specific authorization of a superior court"* (CPL 160.60 [emphasis added]). Respondent essentially claims that, because the 1968 charges were terminated in his favor and "deemed a nullity," he can no longer be "alleged" to have committed the underlying crimes and the records therefore do not qualify for disclosure under Mental Hygiene Law § 10.08 (c).

■ We disagree. CPL 160.60 states by its plain terms that its provisions may be superseded by another statute, such as Mental Hygiene Law § 10.08 (c), that permits disclosure of the sealed information. Although an arrest or prosecution terminated in a defendant's favor must generally be "deemed a nullity" under CPL 160.60, we decline to interpret that statute as barring the disclosure of records that, for the purposes of article 10, relate to a respondent's alleged commission of a sex offense. Finally, to the extent respondent is concerned that a "stigma" may result from the disclosure of his unsealed records—a concern CPL 160.60 is intended to address (*see* Peter Preiser, Practice Commentaries, McKinney's Cons Laws of NY, CPL 160.60)—Mental Hygiene Law § 10.08 (c) already provides that "confidential materials" obtained pursuant to that statute "shall not be further disseminated or otherwise used except for [article 10] purposes."

## B.

In *Floyd Y.*, we defined the extent to which "a court may admit hearsay evidence when it serves as the underlying basis for an expert's opinion in an article 10 proceeding" (*see* 22 NY3d at 98). Because an article 10 proceeding is civil in nature, the respondent is not entitled to the constitutional protections that apply to criminal proceedings under the Fifth and Sixth Amendments (*see id.* at 103-104). Rather, article 10 proceedings must comport with constitutional principles of due process, which demand that "any hearsay basis evidence . . . meet minimum requirements of reliability and relevance before it can be admitted at an article 10 proceeding" (*id.* at 109).

Hearsay basis evidence is admissible at an article 10 trial "if it satisfies two criteria. First, the proponent must demonstrate through evidence that the hearsay is reliable. Second, the court must determine that the 'probative value in helping the jury evaluate the expert's opinion substantially outweighs its prejudicial effect' " (*id.*, citing FRE 703 [alterations omitted]). This two-part analysis "provide[s] a necessary counterweight to the deference juries may accord hearsay evidence simply because an expert has propounded it . . . , yet allow[s] the jury to evaluate expert opinions by considering reliable and probative evidence" (*id.*).

Applying this due process test in *Floyd Y.*, we established ground rules for the admissibility of hearsay basis testimony about the respondent's sex offenses. Hearsay about sex offenses that are supported by "adjudications of guilt," such as convictions or guilty pleas, is inherently reliable and may be admitted through expert testimony without offending due process (*see id.*). Hearsay containing an admission of guilt by the respondent is also generally considered reliable, and if the trial court determines that the probative value of the hearsay outweighs its prejudicial effect, an expert should be permitted to introduce basis testimony about the admission (*id.* at 109-110).

In contrast, hearsay indicating that the respondent was acquitted of a sex offense fails both parts of the due process test: it "cannot provide the basis for reliability" and is generally considered "more prejudicial than probative on the question of the respondent's mental abnormality" (*id.* at 110). Absent some basis to substantiate the accusations underlying the acquitted charges, basis testimony about an acquittal must be excluded (*see id.*). Similarly, hearsay evidence about uncharged crimes should be excluded if the underlying allegations are not supported by an admission from the respondent or extrinsic evidence substantiating those allegations (*see id.*).

The admissibility of hearsay evidence about "[c]riminal charges that resulted in neither acquittal nor conviction" presents a close question to be resolved by the trial court (*see id.*). As we observed in *Floyd Y.*, documentary evidence supporting the charges may "provide[ ] sufficient reliability [that] weigh in favor of admission" of the hearsay, but due process concerns remain in the absence of "conclusive" proof of guilt (*id.*). Accordingly, it is incumbent upon the trial court to closely scrutinize the evidence supporting the charges and ensure that the allegations are "substantially more probative than prejudicial" before allowing the hearsay to be admitted (*id.*).

These "reliability and substantial relevance requirements" for the admission of basis hearsay give the trial court "an active role in managing the article 10 proceeding and preserving its integrity" (*id.* at 109). The trial court is generally accorded broad discretion in making evidentiary rulings, which are entitled to deference on appeal absent an abuse of discretion (*see People v Carroll*, 95 NY2d 375, 385 [2000]; *People v Aska*, 91 NY2d 979, 981 [1998]). Likewise, the decision to admit or preclude hearsay basis evidence at an article 10 trial rests with the trial court's sound discretion, and its decision should not be disturbed unless it results in a clear violation of the respondent's due process rights or otherwise constitutes an abuse of discretion as a matter of law (*see generally Floyd Y.*, 22 NY3d at 110).

### 1. 1968 Charges

██ Respondent's 1968 charges for rape and robbery "resulted in neither acquittal nor conviction" (*id.* at 110). Although respondent pleaded guilty in satisfaction of the indictments, his convictions were vacated and he was never re-indicted. Thus, the 1968 charges never resulted in a valid adjudication of guilt necessary for the hearsay evidence to be considered inherently reliable (*id.* at 109). And there was no independently reliable evidence in the record showing that respondent admitted to committing any of those offenses (*see id.* at 109-110). But respondent was never acquitted of the 1968 charges; that is, no jury found him "not guilty of the charged offense[s]" (Black's Law Dictionary [9th ed 2009], acquittal). Accordingly, for this basis testimony to be properly admitted under *Floyd Y.*'s due process framework, the trial court must determine, based on its "close scrutiny" of the evidence supporting the 1968 charges, that the hearsay information is sufficiently reliable and its probative value in assisting the jury to evaluate the experts' opinions "substantially outweighs [its] prejudicial effect" (*id.* at 109, 110). This standard was satisfied here and Supreme Court did not abuse its discretion by permitting the admission of hearsay related to the 1968 charges.

Using FRE 703 as its guide, Supreme Court reasonably determined that hearsay information concerning the 1968 charges was reliable. This hearsay was derived from a number of documentary sources; all of the experts (including Dr. Plaud) testified that they reviewed and relied upon multiple official records describing the 1968 charges, including indictments, witness statements, arrest records, and presentence reports.

Records related to a respondent's indictment for a sex offense will not necessarily provide a basis of reliability for hearsay in every article 10 case. Circumstances specific to the 1968 charges, however, support Supreme Court's finding that hearsay information in respondent's criminal records was sufficiently reliable. Primarily, the charges were based on complaints from *five* different victims attacked near City College within a 32-day time period. Each attack involved a strikingly similar pattern: the victims alleged that respondent threatened them with a weapon and forced (or attempted to force) them into a secluded space before robbing them and, in the case of three of the victims, raping them. Two of the three rapes took place on roof landings near the same subway stop, and two involved sodomy.

Moreover, respondent was indicted for all five incidents and pleaded guilty to one count each of rape and robbery in satisfaction of all indicted counts. His convictions were later vacated, but that occurred because he was mentally incompetent at the time of his plea. Respondent was never acquitted of the 1968 charges and the evidence underlying the indictments—which a grand jury found was legally sufficient to establish every element of the charged offenses and provided reasonable cause to believe that respondent committed them (*see* CPL 190.65 [1])—has never been called into question. The trial court weighed these considerations when it concluded that the hearsay information about the 1968 charges was sufficiently reliable, and we find no basis upon which to disturb that determination.

Supreme Court also reasonably concluded that the hearsay's probative value to the jury in evaluating the experts' opinions substantially outweighed its prejudicial effect. As we recognized in *Floyd Y.*, article 10 "essentially envisions a 'battle of the experts' to determine whether the respondent has a mental abnormality" (22 NY3d at 105-106). "Factfinders in article 10 trials cannot comprehend or evaluate the testimony of an expert without knowing how and on what basis the expert formed an opinion," and basis hearsay is often necessary "to assist the factfinder with its essential article 10 task of evaluating the experts' opinions" (*id.* at 107, 108).

The State's experts based their mental abnormality diagnoses, in part, on patterns of behavior that they perceived had emerged from respondent's criminal history, such as his propensity to commit sex offenses in public places, to reoffend after having been previously sanctioned for a sex offense, and to use violence to control his victims. It was reasonable for the trial court to

conclude that basis testimony about the 1968 charges (which involved three violent rapes) was necessary for the jury to adequately evaluate whether these opinions were credible or convincing, and that excluding the testimony may have stymied the jury's fact-finding (see id.). Respondent also challenged the basis testimony through cross-examination and competing expert testimony, both important means to expose "the weaknesses of the State's case" and lessen the risk that the jury will accept the hearsay as true (see id. at 108 and n 4).

The trial court, in actively "managing the article 10 proceeding" (id. at 109), also took several steps to limit the prejudicial effect of the hearsay testimony. Critically, the court excluded certain inflammatory hearsay information recounted in the records and, to avoid improper speculation by the jury, prohibited the experts from testifying that respondent was previously convicted under the indictments. The court's limiting instructions also "adequately informed the jury of its role as factfinder and limited purpose of out-of-court statements introduced to help evaluate [the] expert[s'] opinion[s]" (id. at 108).

In sum, we cannot say that the trial court abused its discretion by permitting hearsay basis testimony about the 1968 charges to be put before the jury. The court reasonably determined that this evidence was sufficiently reliable and substantially more probative than prejudicial. The jury, having been offered competing views of the evidence, was properly left to decide which position to accept or reject.

### 2. The Uncharged 1978 Rape

Respondent was arrested but never charged for a second rape he allegedly committed a week after the September 16, 1978 rape that led to his conviction. The second 1978 rape is therefore an "uncharged accusation[ ]," and basis hearsay related to it should have been excluded unless the accusations were substantiated through extrinsic evidence or an admission by respondent (id. at 110). This standard was not met here, and the trial court abused its discretion by allowing the experts to testify about the uncharged rape.

Information about the uncharged rape was culled from a single official record: the 1979 presentence report. In *People v Mingo*, we held that hearsay information found in presentence reports is inherently reliable for purposes of determining the appropriate risk level of a sex offender under the Sex Offender Registration Act (SORA) (12 NY3d 563, 572-573 [2009]). The

State urges us to extend this rule to article 10 proceedings, noting that, as we concluded in *Mingo*, presentence reports are prepared by government officers who have a duty to accurately record relevant information they know "will be relied on by courts" in future proceedings (*id.* at 573).

While these considerations are relevant to whether information from a presentence report is reliable enough to be admitted at an article 10 trial, we decline to import the evidentiary rule from *Mingo* deeming this hearsay automatically reliable. Presentence reports "may well be the single most important document at both the sentencing and correctional levels of the criminal process" (*id.* [citation omitted]), and the hearsay information they contain therefore bears certain indicia of reliability that, if supported by other reliable evidence at an article 10 trial, may warrant the admission of basis testimony about uncharged crimes. But information from a presentence report is not so inherently reliable that it, alone, can sustain the admission of such testimony, and hearsay related to uncharged crimes must be excluded if its only basis for reliability is that it came from a presentence report (*see Floyd Y.*, 22 NY3d at 109). We believe this rule is most appropriate for article 10 proceedings, where the liberty interests at stake are greater than in SORA proceedings and the factfinders are often not judges but juries (*see* Mental Hygiene Law § 10.07 [a]) who have no specialized knowledge of the "origins and function" of presentence reports (*Mingo*, 12 NY3d at 573).

■ Applying these standards here, it is clear that the hearsay about the uncharged 1978 rape was unreliable and should not have been introduced at trial. The allegations contained in the 1979 presentence report were not supported by any other reliable evidence, and respondent has steadfastly denied he committed this crime. The State points to the factual similarities between the first 1978 rape, which led to a conviction, and the uncharged rape as evidence of corroboration, as well as the indication in the 1979 presentence report that the police were able to connect respondent to the first rape based on information they received from the second victim. The State's argument, however, assumes that the presentence report's description of both the uncharged rape and the police's subsequent investigation is reliable. That assumption, which the trial court also made, is improper in the absence of supporting evidence or an admission from respondent.

■ We conclude, however, that the trial court's error in admitting the unreliable hearsay was harmless and does not require

reversal. The State's case against respondent rested primarily on admissible evidence; particularly, expert basis testimony about respondent's rape and robbery charges, his two convictions for rape, his assault on a female correction officer, and his refusal to participate in sex offender treatment while in prison. The jury also heard testimony from a parole officer that respondent admitted to committing one of the 1968 rapes for which he was charged. This evidence, without reference to the uncharged 1978 rape, provided a sufficient basis for the jury to conclude that respondent suffers from a mental abnormality, and there is no "reasonable possibility that the jury could have reached another verdict" had it not heard basis testimony about that uncharged crime (*Floyd Y.*, 22 NY3d at 110, citing *People v Crimmins*, 36 NY2d 230, 237 [1975]; *see Matter of State of New York v Mark S.*, 87 AD3d 73, 78 [3d Dept 2011], *lv denied* 17 NY3d 714 [2011]; *Matter of State of New York v Fox*, 79 AD3d 1782, 1783 [4th Dept 2010]).

## C.

Respondent's remaining claims concern the sufficiency of the evidence supporting the jury's verdict that he suffers from a mental abnormality. Respondent does not dispute that the evidence was sufficient for the jury to find he currently suffers from antisocial personality disorder, a diagnosis both parties' experts agreed upon. Nor does he claim that antisocial personality disorder is an unreliable diagnosis that is not accepted by the psychiatric profession and should be excluded from article 10 proceedings (*cf. Matter of State of New York v Shannon S.*, 20 NY3d 99, 106-107 [2012]). Rather, respondent argues that the State's evidence was insufficient to show that antisocial personality disorder is currently impacting him in a manner that results in both a predisposition to commit sex offenses and a serious difficulty controlling the behavior, both of which are required to support a finding of mental abnormality (*see* Mental Hygiene Law § 10.03 [i]).

Contrary to respondent's claims, we conclude that the evidence, considered in the light most favorable to the State, was sufficient to support the jury's verdict (*see Matter of State of New York v Derrick B.*, 68 AD3d 1124, 1126-1127 [2d Dept 2009], citing *Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]). During their testimony, the State's experts explained how respondent's sex crimes were not simply isolated incidents, but a result of his antisocial personality disorder, and that the

traits that account for this disorder—such as his impulsivity, aggression, disregard for social norms, and indifference to harming others—result in respondent's pathological sense of entitlement and serious difficulty controlling his sexual conduct. The jury was entitled to credit this expert testimony, which was supported not only by respondent's history of sex offending, but also by his prison disciplinary record, denial of his crimes, and failure to partake in prison sex offender treatment, among other things. Moreover, the evidence indicating that respondent has raped women at three separate periods over a span of decades, notwithstanding serious sanctions, could lead a rational jury to conclude that respondent suffers from the serious lack of control over his conduct required for a mental abnormality finding (*see Shannon S.*, 20 NY3d at 107-108). Although respondent's expert testified that respondent is unlikely to reoffend based on his age, the jury could have reasonably rejected this assertion in light of competing testimony from the State's experts.

### D.

Accordingly, the Appellate Division order should be affirmed, without costs.

RIVERA, J. (dissenting). At respondent's Mental Hygiene Law article 10 jury trial, Supreme Court permitted the State's experts to introduce hearsay regarding a 1968 indictment on rape and robbery charges. Those charges did not result in a lawful conviction. Although respondent pleaded guilty in satisfaction of the charges, his plea was taken in violation of his constitutional rights, and the resulting conviction was vacated and the criminal records sealed pursuant to CPL 160.50. Admission of hearsay related to those charges violated respondent's due process rights because the charges were not supported by independent indicia of reliability. Further, the evidence was more prejudicial than probative of respondent's alleged mental abnormality given the number of charges and the nature of the crimes involved. Moreover, I join Judge Smith's dissent and share the concerns expressed therein. I would reverse the order of the Appellate Division.

In *Matter of State of New York v Floyd Y.* (22 NY3d 95 [2013]), we determined that article 10 hearings are subject to procedural due process. We engaged in the due process balancing test required by *Mathews v Eldridge* (424 US 319, 335 [1976]), and established a framework to govern the introduction of hearsay that formed the basis of an expert's opinion in an article 10

trial. We concluded that without the opportunity to consider such hearsay, an article 10 jury cannot determine whether an expert's opinion is sound and whether the State has met its burden to establish that the respondent suffers from a mental abnormality (see Mental Hygiene Law § 10.07 [c], [d]). "Factfinders in article 10 trials cannot comprehend or evaluate the testimony of an expert without knowing how and on what basis the expert formed an opinion" (Floyd Y., 22 NY3d at 108).

However, due process requires that an article 10 court scrutinize basis hearsay before allowing its admission. In considering the proper expanse of due process mandates we recognized that a respondent in an article 10 proceeding faced with potential indefinite confinement has "a liberty interest of the highest order" (Floyd Y., 22 NY3d at 105, citing Kansas v Hendricks, 521 US 346, 356 [1997], Vitek v Jones, 445 US 480, 494-495 [1980], and Humphrey v Cady, 405 US 504, 509 [1972]). That interest, along with the high risk of juror reliance on unreliable and prejudicial evidence introduced by experts, outweighed the State's significant interest in effectuating the purposes of article 10. We therefore required that basis evidence satisfy a two-part test for reliability and probative value (id. at 106).

This test was designed to ensure sufficient protection for respondent's rights and to "provide a necessary counterweight to the deference juries may accord hearsay evidence simply because an expert has propounded it" (id. at 109). The test reflected our recognition that evidence at article 10 proceedings involves horrible facts and crimes, and "[j]uries may be predisposed to doubt the convicted sex offender and believe the State's expert" (id. at 106). In short, basis hearsay is inadmissible unless it meets the requirements of Floyd Y. The improper admission of such evidence violates a respondent's due process rights and may constitute reversible error (see id. at 110; People v Crimmins, 36 NY2d 230, 237 [1975]).

Here, the court permitted the State's experts to testify about the 1968 charges and their underlying facts, finding the reliability of this evidence supported by the criminal complaint, arrest records, grand jury indictment, respondent's guilty plea, and presentence reports.[1] The majority agrees, holding,

1. Notably, Supreme Court did not understand that basis testimony is not admissible for the truth, and the expert cannot testify as to the respondent's guilt. During a colloquy with counsel, Supreme Court observed that "Dr. Kirschner, essentially, will say that he thinks [respondent] raped three women in

incorrectly in my opinion, that the information found in these documents, together with the plea, establishes reliability under *Floyd Y.* For although the majority correctly concludes that respondent's vacated conviction on the 1968 charges does not establish the reliability of the underlying allegations (majority op at 344), it erroneously finds that those charges were supported by independent indicia of reliability found in the documentary evidence, the similarities among the 1968 incidents, the grand jury's indictment, respondent's guilty plea, and the fact that he was never acquitted of the crimes (majority op at 344-345).

The information relied on by the majority does not independently establish the reliability of the 1968 charges because the facts in the criminal record assume what they are intended to prove: the truth and accuracy of the allegations. A showing of independent reliability requires more than information that rests on the foundation of the unproven allegations themselves. The documentary evidence relied on by the majority illustrates why this information cannot meet the demands of due process. This evidence consists of the original allegations and records related to the police investigation and grand jury indictment. None of this evidence provides a separate basis to assess the truth and accuracy of the complainants' charges because these documents were based on those very same allegations. Yet, those allegations have not survived the adjudicative process. Indeed, the majority concedes that these types of documents are insufficient to meet the test of reliability,[2] and relies on what it calls "[c]ircumstances specific to the 1968 charges" in an attempt to shore up its ultimate conclusion that the charges are admissible (majority op at 345). The majority's reliance is to little avail, because those circumstances no more establish independent reliability for the 1968 charges than do the allegations themselves.

The majority finds reliability based on the number of complaints and the similarity of the alleged crimes. Yet, these factual details do not support the reliability of the allegations.

---

1968, and that is part of his opinion. And he is going to back that up by the fact that, you know, a Grand Jury found reasonable cause to believe he committed these acts." Testifying to the truth of hearsay and backing up that testimony with facts is precisely what experts are not permitted to do in article 10 trials (*see Floyd Y.*, 22 NY3d at 107).

2. "Records related to a respondent's indictment for a sex offense will not necessarily provide a basis of reliability for hearsay in every article 10 case" (majority op at 345).

Whether there was one rape or several, whether the rapes involved robberies, and whether they occurred near the same area within a short span of time does not answer the question whether it can reliably be said that respondent committed the criminal acts. These circumstances may reveal a pattern of behavior, but *Floyd Y.* held that uncharged accusations that appeared to fit a pattern of conduct were nevertheless inadmissable when they were unsupported by extrinsic evidence or admissions of guilt. In other words, a pattern of conduct does not provide independent indicia of reliability (*see Floyd Y.*, 22 NY3d at 110 [rejecting the reliability of uncharged accusations made by a crime victim's twin sister despite the evident similarity between those allegations and the proven crime]).

The grand jury's finding of reasonable cause is also insufficient to satisfy the reliability requirement. Grand jury proceedings are not the equivalent of a trial, wherein evidence is subjected to the rules of evidence and criminal procedure and a defendant has an opportunity to confront the accuser. Due to the difference between the rules of evidence in grand juries and trial courts, we have previously found grand jury testimony to be unreliable. Grand jury testimony is "troubling because 'although given under oath, [it] is not subjected to the vigorous truth testing of cross-examination' " (*People v Geraci*, 85 NY2d 359, 368 [1995], citing *United States v Thevis*, 665 F2d 616, 629 [5th Cir 1982]). As we noted, "grand jury testimony is often obtained through grants of immunity, leading questions and reduced attention to the rules of evidence—conditions which tend to impair its reliability" (*Geraci*, 85 NY2d at 368, citing *United States v Flores*, 985 F2d 770, 776 n 14 [5th Cir 1993], *United States v Fernandez*, 892 F2d 976, 981 [11th Cir 1989], and *United States v Gonzalez*, 559 F2d 1271, 1273 [5th Cir 1977]). Respondent's significant liberty interest should not be placed in jeopardy by grand jury findings based on testimony which might wither under defense counsel's questioning and trial rules of evidence.

Both Supreme Court and the majority conclude that respondent's guilty plea provides further proof of the reliability of the 1968 charges. The majority minimizes the significance of the vacatur of the conviction and the Second Circuit's finding that respondent was incompetent at the time of the plea because he "was never acquitted of the 1968 charges" (majority op at 344). In essence, the majority treats the lack of an acquittal as the functional equivalent of proof of guilt. Of course these are not

the same. As a legal nullity, respondent's plea and conviction neither prove nor disprove anything, and they cannot support a conclusion that the criminal charges were true. The criminal proceedings concluded when the respondent admitted his guilt, but, as the federal courts recognized, his plea was constitutionally infirm. Respondent was incompetent at the time of the plea, which negates the reliability of his admission of guilt. The inescapable conclusion is that the lack of acquittal is irrelevant, and the unconstitutional result in the 1968 proceedings can have no bearing on the present case.

The admission of hearsay evidence regarding the 1968 charges prejudices the respondent and was not harmless error. Without the 1968 charges, and the uncharged 1978 allegation that the majority finds inadmissible, the jury would have been left to consider only two rape convictions, an alleged assault on a female correction officer, and testimony regarding respondent's lack of participation in sex offender treatment. On this record, it is plain that testimony about the four unreliable allegations of rape significantly influenced the jury, and "[t]here is a reasonable possibility the jury could have reached another verdict had it not heard" the inadmissible hearsay basis evidence (*Floyd Y.*, 22 NY3d at 110; *Crimmins*, 36 NY2d at 237). Therefore, the Appellate Division should be reversed.

Today's decision ignores the central concern articulated in *Floyd Y.*, namely that admission of hearsay basis evidence poses a substantial risk to an article 10 respondent's liberty interest. In order to overcome this risk, basis evidence must be supported by independent indicia of reliability, and must have sufficient probative value to outweigh any prejudice to the respondent. By approving presentation to the jury of the 1968 charges and unreliable documentary evidence, the majority opens the door to the admission, under the guise of permissible expert basis evidence, of the type of unreliable and prejudicial hearsay we disapproved in *Floyd Y.* This creates the risk of future article 10 jury determinations influenced more by the fact that the expert testifies to the evidence than by the evidence itself. Therefore, I dissent.

Smith, J. (dissenting). I dissented in *Matter of State of New York v Floyd Y.* (22 NY3d 95 [2013]). Being now constrained to follow *Floyd Y.*, I join Judge Rivera's dissent in this case.

I add a few words to express my disappointment that John S. has not argued that a civil commitment under Mental Hygiene

Law article 10 may not be based solely on a diagnosis of antisocial personality disorder. That seems to me a strong argument, for reasons I have previously explained (*see Matter of State of New York v Shannon S.*, 20 NY3d 99, 110 [2012, Smith, J., dissenting] ["If a diagnosis of ASPD could support civil commitment, the State could have locked up half of those now in prison without bothering with the complexities of the criminal law"]).

Judges GRAFFEO, READ and PIGOTT concur with Judge ABDUS-SALAAM; Judge RIVERA dissents in an opinion in which Chief Judge LIPPMAN and Judge SMITH concur; Judge SMITH in a separate dissenting opinion in which Chief Judge LIPPMAN and Judge RIVERA concur.

Order affirmed, without costs.