[21 NE3d 239, 996 NYS2d 610]

In the Matter of STATE OF NEW YORK, Respondent, v DONALD DD., Appellant.

In the Matter of STATE OF NEW YORK, Respondent, v KENNETH T., Appellant.

Argued September 18, 2014; decided October 28, 2014

## POINTS OF COUNSEL

*George J. Hoffman, Jr.,* Albany, for appellant in the first above-entitled proceeding. Donald DD.'s diagnosis with antisocial personality disorder, together with his minimal sexual offense history and the absence of an accompanying diagnosis with a sexual based disorder, cannot support the statutorily required finding of mental abnormality. (*Kansas v Hendricks,* 521 US 346; *Kansas v Crane,* 534 US 407; *Foucha v Louisiana,* 504 US 71; *Matter of State of New York v Shannon S.,* 20 NY3d 99; *Matter of State of New York v Floyd Y.,* 22 NY3d 95; *Matter of State of New York v Enrique D.,* 22 NY3d 941; *United States v Wilkinson,* 646 F Supp 2d 194; *United States v Begay,* 880 F Supp 2d 707; *United States v Graham,* 683 F Supp 2d 129; *United States v Timms,* 664 F3d 436.)

*Eric T. Schneiderman, Attorney General,* Albany (*Kathleen M. Treasure, Barbara D. Underwood, Andrea Oser* and *Nancy A. Spiegel* of counsel), for respondent in the first above-entitled proceeding. The jury's verdict that Donald DD. suffers from a mental abnormality is soundly based and should not be disturbed. (*Morales v County of Nassau,* 94 NY2d 218; *Matter of State of New York v Shannon S.,* 20 NY3d 99; *United States v Caporale,* 701 F3d 128; *Brown v Watters,* 599 F3d 602; *Drake v Portuondo,* 321 F3d 338; *Young v Murphy,* 615 F3d 59; *Adams v Bartow,* 330 F3d 957; *Linehan v Milczark,* 315 F3d 920; *McGee v Bartow,* 593 F3d 556; *Kansas v Hendricks,* 521 US 346.)

*Lesley M. DeLia, Mental Hygiene Legal Service,* Mineola (*Ana Vuk-Pavlovic* and *Dennis B. Feld* of counsel), for appellant in the second above-entitled proceeding. Where the State's expert assigned paraphilia not otherwise specified to Kenneth T. based on nothing more than his past sex crimes, and where the testimony did not show that antisocial personality disorder caused Kenneth T. to sexually offend or even that it was properly diagnosed, the evidence was legally insufficient to support a finding that Kenneth T. had a mental abnormality. (*Addington v Texas,* 441 US 418; *Humphrey v Cady,* 405 US 504; *Matter of*

*State of New York v Floyd Y.*, 22 NY3d 95; *Kansas v Hendricks*, 521 US 346; *Vitek v Jones*, 445 US 480; *Foucha v Louisiana*, 504 US 71; *Kansas v Crane*, 534 US 407; *Varner v Monohan*, 460 F3d 861; *People v C.M.*, 23 Misc 3d 1125[A], 2009 NY Slip Op 50935[U]; *Matter of Storar*, 52 NY2d 363.)

*Eric T. Schneiderman, Attorney General*, New York City (*Bethany A. Davis Noll, Barbara D. Underwood* and *Steven C. Wu* of counsel), for respondent in the second above-entitled proceeding. I. Kenneth T.'s categorical challenge to his psychiatric diagnoses does not undermine Supreme Court's mental abnormality finding. (*Matter of State of New York v Shannon S.*, 20 NY3d 99; *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 US 579; *People v Wesley*, 83 NY2d 417; *Matter of George L.*, 85 NY2d 295; *People v Brown*, 97 NY2d 500; *Adamy v Ziriakus*, 92 NY2d 396; *United States v Barrow*, 400 F3d 109; *Crawford v Merrill Lynch, Pierce, Fenner & Smith*, 35 NY2d 291; *Board of Educ. of Belmont Cent. School Dist. v Gootnick*, 49 NY2d 683; *People v Jovanovic*, 263 AD2d 182.) II. The unrebutted evidence at trial more than adequately supports Supreme Court's finding of mental abnormality. (*Matter of Hofbauer*, 47 NY2d 648; *United States v Carta*, 592 F3d 34; *Young v Murphy*, 615 F3d 59.)

### OPINION OF THE COURT

PIGOTT, J.

In *Matter of State of New York v Donald DD.*, we hold that, in a Mental Hygiene Law article 10 trial, evidence that a respondent suffers from antisocial personality disorder cannot be used to support a finding that he has a mental abnormality as defined by Mental Hygiene Law § 10.03 (i), when it is not accompanied by any other diagnosis of mental abnormality. We dismiss the proceeding in *Matter of State of New York v Kenneth T.* on the ground of legal insufficiency. We begin our discussion with that appeal.

### I.

On December 16, 1982, respondent Kenneth T., 27, brandished a knife and forced a 17-year-old girl to accompany him to a rooftop, where he raped her. He also stole her coat. Kenneth T. was arrested after being seen wearing the coat, and his victim identified him in a lineup. In November 1983, following trial, he was convicted of rape in the first degree, robbery in the first degree, and possession of stolen property in the third degree, and sentence was imposed.

In September 1999, Kenneth T. was conditionally released to parole, having served some 17 years in prison. On October 31, 2000, Kenneth T., while employed at a university cafeteria, offered a female student a ride to the train station. He drove to a parking lot, ordered the woman out of his car, threw her to the ground, and attempted to rape her. The woman resisted, biting one of Kenneth T.'s fingers when he tried to cover her mouth and leaving a bite mark on the finger. She was able to escape when a passerby observed the commotion. Kenneth T. was arrested, and pleaded guilty to attempted rape in the first degree. In January 2001, he was sentenced to eight years' imprisonment to be followed by five years' postrelease supervision.

During his incarcerations, Kenneth T. incurred disciplinary "tickets," the most serious offenses being assault on staff, disobeying a direct order, and harassment, and he was removed from sex offender counseling for disciplinary reasons on three occasions. However, he was not accused of any sexual "acting out" while in prison.

## II.

In October 2008, as he was about to be released to postrelease supervision, the State commenced this civil commitment proceeding against Kenneth T. under Mental Hygiene Law article 10. At a probable cause hearing, Dr. Paul Etu, a board-certified psychologist who had interviewed Kenneth T. and reviewed his records, testified that in his opinion Kenneth T. suffered from a mental abnormality as defined by Mental Hygiene Law § 10.03 (i). Among other things, Dr. Etu testified that Kenneth T. had told him that he had difficulty controlling his sexual impulses. Supreme Court found probable cause to believe that Kenneth T. was a sex offender requiring civil management.

Following the hearing, Kenneth T. was committed to a secure treatment facility pending the conclusion of the article 10 proceeding. In June 2010, a bench trial was held in Supreme Court, pursuant to Mental Hygiene Law § 10.07, on the issue of whether Kenneth T. suffered from a mental abnormality within the meaning of Mental Hygiene Law § 10.03 (i).

The State presented a licensed psychologist, Dr. Stuart Kirschner, who had interviewed Kenneth T. and reviewed his records. Dr. Kirschner opined that Kenneth T. had two disorders that, together, predisposed him to the commission of conduct constituting a sex offense and resulted in his having serious dif-

ficulty in controlling that conduct: "paraphilia[1] not otherwise specified" (paraphilia NOS) and "antisocial personality disorder" (ASPD).

Dr. Kirschner defined "paraphilia NOS" using the "broad criteria" that characterize paraphilia in general: "sexual fantasies, urges or behaviors directed . . . at inanimate objects or non-consenting partners or minors." Specifically, Dr. Kirschner testified that in his opinion Kenneth T. had "sexual fantasies, urges or behaviors involving non-consenting partners." Challenged on cross-examination as to whether he could diagnose paraphilia NOS without any direct evidence that Kenneth T. was sexually aroused by nonconsensual sexual activity, Dr. Kirschner suggested that such arousal could be inferred simply from "the way [Kenneth T.] conducted himself during . . . the two offenses." However, Dr. Kirschner admitted that he was "not sure" whether Kenneth T. found the nonconsensual aspect of his crimes sexually arousing.

With respect to ASPD, Dr. Kirschner testified that this disorder is characterized by "violations of the law, disregard for the truth, lack of remorse, irritability and aggressiveness," as well as "irresponsibility in the sense that the person does not meet financial responsibilities."[2] Dr. Kirschner opined that Kenneth T. met "[p]retty much all of" these criteria of ASPD.

Dr. Kirschner conceded that ASPD could be found in most prison inmates ("probably . . . 80 percent"). He also testified that ASPD does not "in and of itself" show mental abnormality as defined by Mental Hygiene Law article 10.

Dr. Kirschner attached special significance to the fact that, in his view, Kenneth T. suffered both from paraphilia and from ASPD. He testified that the paraphilia predisposed Kenneth T. to commit rape, and his ASPD gave rise to a serious difficulty in controlling the urge to rape. Dr. Kirschner identified Kenneth

---

1. According to the Diagnostic and Statistical Manual of Mental Disorders, "[t]he essential features of a Paraphilia are recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other nonconsenting persons that occur over a period of at least 6 months" (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 566 [4th ed Text Rev 2000]).

2. In addition, psychologist witnesses in the cases before us have testified that in order for a person to be properly diagnosed with ASPD, he or she must be 18 or older, his or her antisocial acts must not have been committed while in a manic or psychotic state, and there must be some evidence of conduct disorder prior to the age of 15.

T.'s ASPD with a lack of "ability to think before he acts," "internal [braking] mechanism," or "internal controls such as a conscience that might curb his impulses."

As evidence that Kenneth T. had serious difficulty in controlling his sexual misconduct, Dr. Kirschner identified two factors. The first was that Kenneth T. carried out offenses in circumstances that would allow for his identification by the victims. (In particular, Kenneth T. committed the first offense in a neighborhood that he frequented, and afterwards wore a coat he had taken from the victim, while the second victim was a woman who knew Kenneth T. and could easily give the police information leading to his arrest.) The second was the fact that Kenneth T. attempted the second rape despite having spent some 17 years in prison for the earlier crime.

Following the bench trial, Supreme Court concluded that Kenneth T. had a condition, disease or disorder that predisposed him to the commission of conduct constituting a sex offense and resulted in his having serious difficulty in controlling such conduct. Kenneth T. moved to set aside the verdict, arguing that the evidence was legally insufficient. Kenneth T. contended that Dr. Kirschner believed him to have a mental abnormality under Mental Hygiene Law article 10 purely on the basis of his crimes—crimes that in themselves did not distinguish him adequately from recidivist rapists who do not suffer from mental abnormality of this kind. Supreme Court denied the motion.

A dispositional hearing was held, pursuant to Mental Hygiene Law § 10.07 (f), and Supreme Court found that Kenneth T. suffered from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that he was likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility (see Mental Hygiene Law § 10.03 [e]). Accordingly, Supreme Court ordered that Kenneth T. be confined.

Kenneth T. appealed. The Appellate Division affirmed Supreme Court's order (106 AD3d 829 [2d Dept 2013]), ruling that "Supreme Court's finding that the State established, by clear and convincing evidence, that the appellant suffers from a 'mental abnormality,' as that term is defined in Mental Hygiene Law § 10.03 (i), was warranted by the facts" (id. at 830).

We granted Kenneth T. leave to appeal, and now reverse.

### III.

On July 26, 2002, respondent Donald DD., then 18, had sexual intercourse with a 14-year-old acquaintance. As she later recalled, she "fell for his wit and . . . had sex with him." Donald DD. then asked the girl whether her 12-year-old cousin would have sex with him. The younger girl was afraid, and did not resist when Donald DD. partially inserted his penis into her vagina. The two girls told the authorities what had occurred, and Donald DD. was arrested. At the time, Donald DD. was on probation, following a conviction of criminal contempt in the second degree for violating an order of protection obtained against him by an ex-girlfriend.

Donald DD. pleaded guilty to rape in the second degree (Penal Law § 130.30 [1] [being 18 years old or more, he or she engages in sexual intercourse with another person less than 15 years old]), attempted rape in the second degree (under the same statute), and endangering the welfare of a child. In January 2004, he was convicted and sentenced to six months' imprisonment and 10 years' probation.

On July 1, 2004, after release from prison, Donald DD. persuaded a young woman, a close friend of his wife, to accompany him on a walk to a local cemetery. There, he kissed the woman and, ignoring her repeated protests, had sexual intercourse with her. Afterwards, the woman returned to Donald DD.'s house with him; when she was leaving, he said he knew she was "good at keeping secrets" and added that they would "both be in trouble" if she revealed what had happened. The young woman, however, sought medical help and gave a statement to the police. Donald DD. was arrested.

Donald DD. pleaded guilty to sexual abuse in the second degree. He was sentenced to six months' imprisonment; he remained on probation upon release. Donald DD.'s probation was revoked in the summer of 2006, after he was arrested following an incident in which he threw stones or rocks at an acquaintance's car, injuring a passenger.

In April 2007, Donald DD. was resentenced on the January 2004 convictions, to 1 to 3 years' imprisonment. He participated in sex offender treatment while incarcerated.

In the spring of 2008, Donald DD. was evaluated for civil management under Mental Hygiene Law article 10. A psychiatric examiner, Dr. Mark Cederbaum, opined that Donald DD. suffered from ASPD, but did *not* have a mental abnormality within the meaning of Mental Hygiene Law § 10.03 (i).

Donald DD. was conditionally released to parole supervision in June 2008. Donald DD.'s special conditions of release included that he "not be in contact with" anyone under 18, "without the presence of an adult." Donald DD. and his wife had two children, a five-year-old boy and a three-year-old girl. His wife's sister had primary physical custody of the children, but they spent weekends at the apartment in which Donald DD. and his wife lived. In December 2008, the state police and the county child protective services investigated allegations by Donald DD.'s children that one evening when he was alone with them, Donald DD. had touched their "privates" and encouraged them to touch each other's and his "privates." Additionally, Donald DD.'s wife told the police that on occasions when she did not want to have sex with Donald DD., he would force himself on her.

The District Attorney decided not to pursue criminal charges against Donald DD. However, his parole was revoked, and he was returned to custody to serve the remainder of his 2007 maximum sentence.

## IV.

In June 2009, the State commenced this civil commitment proceeding against Donald DD. under Mental Hygiene Law article 10. Following a probable cause hearing, Donald DD. was committed to a secure treatment facility pending the conclusion of the proceeding. On March 2, 2010, a jury trial commenced in Supreme Court, pursuant to Mental Hygiene Law § 10.07, on the issue of whether Donald DD. suffered from a mental abnormality as defined by Mental Hygiene Law § 10.03 (i).

The State presented two licensed psychologists, Dr. Christopher Kunkle and Dr. Richard Hamill, as witnesses, both of whom had interviewed Donald DD. and reviewed his records. Dr. Kunkle and Dr. Hamill opined that Donald DD. suffered from ASPD, defined as set forth above. They described the disorder as "characterized by a pervasive pattern of disregard for others and violation of the law" and testified that an individual who meets at least three of seven specific criteria may be diagnosed with the disorder. The criteria, as the State's experts explained, may be summed up as: failure to conform to social norms and laws, impulsivity, aggressiveness, disregard for the safety of self or others, lack of remorse, deceitfulness, and irresponsibility.

Dr. Kunkle concluded that Donald DD. had all seven traits, while Dr. Hamill concluded that he had at least six.[3]

Dr. Kunkle noted that "a very small portion of individuals with antisocial personality disorders . . . are actually incarcerated for a sexual offense," estimating that the proportion was 7%. As he explained, "[s]ome sex offenders have antisocial personality disorder, some don't. Some with antisocial personality disorder commit sex offenses and some don't." However, Dr. Kunkle stated that Donald DD.'s ASPD predisposed him to commit conduct constituting a sex offense:

> "In [Donald DD.'s] case, his disorder predisposes him in a way because his behavior has shown you that. His behavior has shown you what goes on inside his mind, and he acts upon the urges that he has. When [Donald DD.] has a sexual urge towards 12 and 14 year old girls, a wife's friend, his own children, he acts upon that urge and neglects the laws that govern."

Asked about the concept of paraphilia, Dr. Kunkle testified that he had *not* diagnosed Donald DD. with paraphilia, which he defined as "a sexual disorder where the person has abnormal sexual interests." He opined that, although ASPD is not a paraphilia, it can nevertheless be a mental abnormality within the meaning of Mental Hygiene Law § 10.03 (i). He testified that

> "[i]f someone has antisocial personality disorder and they showed a pattern where they continuously act in a way that they violate laws and those violations are sexual, then they have shown that through their antisocial personality disorder they are predisposed to commit sexual crimes."

Dr. Kunkle further opined that Donald DD.'s ASPD resulted in his having serious difficulty in controlling his sex-offending conduct. He pointed to Donald DD.'s tendency to commit both sexual and non-sexual offenses, in spite of past incarcerations, despite sex offender treatment, and while on probation, as evidence that the ASPD was "driving" his illegal actions.

Consistently with Dr. Kunkle's testimony, Dr. Hamill observed that "the large majority, 93 percent of those diagnosed with

---

**3.** In addition, both experts opined that Donald DD. suffered from an extreme form of ASPD known as psychopathy. However, they did not testify that this finding materially affected their conclusions regarding Donald DD.'s mental abnormality under article 10.

[ASPD,] are not sex offenders." Dr. Hamill accepted the proposition that ASPD does not "in and of itself predispose a person to commit conduct constituting a sex offense." Nonetheless, he opined that ASPD predisposed Donald DD. to engage in conduct constituting a sex offense. Asked what had led him to this conclusion, Dr. Hamill mentioned the fact that Donald DD.'s victims were "male and female and in three major age groups."

Dr. Hamill further opined that Donald DD.'s ASPD resulted in his having serious difficulty in controlling his sex-offending conduct. He testified that the ASPD affected Donald DD.'s emotional, cognitive, and volitional capacities: "predispos[ing] him to act out impulsively in an aggressive manner," creating "cognitive distortions," and inhibiting his "ability to control [his] behavior and keep it according to . . . [his] sense of right and wrong."

Finally, the State called Dr. Mark Cederbaum, who had examined Donald DD. in 2008 and found no mental abnormality. Dr. Cederbaum stated that he could no longer stand by his original opinion, especially in light of the recent allegations that Donald DD. had sexually abused his own children and engaged in spousal rape.[4]

For his part, Donald DD. presented the testimony of a licensed psychologist, Dr. Joseph J. Plaud, who had also examined Donald DD. and reviewed his records. Dr. Plaud opined that there was no evidence that Donald DD. suffered from a condition that predisposed him to commit sex offenses and caused him to have serious difficulty controlling this conduct. Rather, Dr. Plaud saw Donald DD. as an *opportunistic offender.*

With respect to ASPD, Dr. Plaud opined that the condition "is not particular to sexual control. I would say the vast majority of individuals in all the state prisons in this state could be diagnosed with antisocial personality disorder. By definition they all have difficulty conforming their behavior to the law." He explained that ASPD can act "in combination with . . . a diagnosable sexual disorder, and . . . can add extra fuel to the fire, if you will," but cannot "in and of itself . . . predict sexual impulse control."

Donald DD. himself testified, admitting to the sexual crimes involving the 14 year old and 12 year old but protesting that he

---

**4.** No objections were raised to the admission of evidence of uncharged sexual misconduct (*see generally Matter of State of New York v Floyd Y.,* 22 NY3d 95 [2013]).

had not known their ages, and insisting that the sexual activity with his wife's friend in the cemetery had been consensual.

The jury found that Donald DD. had a condition, disease or disorder that predisposed him to the commission of conduct constituting a sex offense and resulted in his having serious difficulty in controlling such conduct. Donald DD. moved to set aside the verdict, contending, inter alia, that ASPD is an inapplicable predicate for a finding of mental abnormality because it is "not a sexual disorder." Supreme Court denied the motion.

Following a dispositional hearing, Supreme Court found that Donald DD. suffered from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that he was likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility. Accordingly, Supreme Court ordered that Donald DD. be confined.

Donald DD. appealed, again challenging the use of ASPD as a basis for the jury's finding of mental abnormality.

The Appellate Division affirmed Supreme Court's order (107 AD3d 1062 [3d Dept 2013]), holding that a mental condition need not itself have any sexual component in order to predispose a person to the commission of conduct constituting a sex offense and result in that person's having serious difficulty in controlling such conduct. The Appellate Division reasoned that ASPD

> "affects the emotional and volitional capacity of its sufferers by predisposing them to act upon their urges in an aggressive manner. Petitioners' experts found respondent to have inappropriate sexual urges given his pattern of engaging in sex offenses, and that the disorder caused him to disregard any restraints he may have had against acting upon them. Those experts further opined that respondent's repeated commission of sex offenses demonstrated his serious difficulty in restraining those impulses, particularly because he acted upon them despite knowing that he was under supervision and having already undergone sex offender treatment" (*id.* at 1064 [internal quotation marks omitted]).

We granted Donald DD. leave to appeal, and now reverse.

## V.

Kenneth T.'s article 10 trial differed from Donald DD.'s in that the factfinder heard evidence that Kenneth T. suffered not only from ASPD but also from paraphilia NOS. In *Matter of*

*State of New York v Shannon S.* (20 NY3d 99 [2012]), this Court held that "any issue pertaining to the reliability of paraphilia NOS as a predicate condition for a finding of mental abnormality" may be "viewed as a factor relevant to the weight to be attributed to the diagnosis, an issue properly reserved for resolution by the factfinder" (*id.* at 107). The Court observed that

> "[a]ny professional debate over the viability and reliability of paraphilia NOS is subject to the adversarial process which, by vigorous cross-examination, would expose the strengths and weaknesses of the professional medical opinions offered in reaching a considered legal determination as to whether a respondent suffers a mental abnormality, as defined by statute" (*id.* [internal quotation marks omitted]).

Paraphilia NOS is a controversial diagnosis. It is listed in the current edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, but only as a "catch-all" category for paraphilias that are not specifically enumerated elsewhere in the manual because they are "less frequently encountered" (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 567 [4th ed Text Rev 2000]). The examples given include necrophilia (sexual attraction to corpses) and zoophilia (sexual attraction to animals) (*see id.* at 576). In the dissent in *Shannon S.*, three members of this Court who are now in the majority stated our view that the paraphilia NOS diagnosis presented by Dr. Kirschner[5] and another expert witness in that case "amount[ed] to junk science devised for the purpose of locking up dangerous criminals" and we expressed "grave doubt" whether such a "diagnosis would survive a *Frye* hearing to determine whether it is 'sufficiently established to have gained general acceptance' in the psychiatric community" (*Shannon S.*, 20 NY3d at 110 [Smith, J., dissenting, joined by Lippman, Ch. J., and Pigott, J.], quoting *Frye v United States*, 293 F 1013, 1014 [DC Cir 1923]).[6]

---

5. It appears that Dr. Kirschner has frequently testified for the State in Mental Hygiene Law article 10 trials.

6. Prominent members of the psychiatric community have criticized the practice of diagnosing so-called "paraphilia NOS nonconsent" on the basis of a history of committing sex crimes (Allen Frances & Michael B. First, *Paraphilia NOS, Nonconsent: Not Ready for the Courtroom*, 39 J Am Acad Psychiatry L 555 [Dec. 2011]; Allen Frances et al., *Defining Mental Disorder When It Really Counts: DSM-IV-TR and SVP/SDP Statutes*, 36 J Am Acad Psychiatry L 375 [Sept. 2008]).

Nonetheless, we do not overrule *Shannon S.* The doctrine of stare decisis governs here, "rest[ing] upon the principle that a court is an institution, not merely a collection of individuals, and that governing rules of law do not change merely because the personnel of the court changes" (*People v Bing*, 76 NY2d 331, 338 [1990]). Stare decisis is "the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process" (*Payne v Tennessee*, 501 US 808, 827 [1991]). We perceive no compelling justification for overruling *Shannon S.*'s holding that a diagnosis of paraphilia NOS was sufficient to support a finding of mental abnormality on the record in that case. We did not, however, decide in *Shannon S.* the question that would be decided at a *Frye* hearing: whether the diagnosis of paraphilia NOS, as testified to by the State's experts, has received general acceptance in the psychiatric community. Nor do we decide that question today, because here, as in *Shannon S.*, no *Frye* hearing was requested or held.

■ In the present case, it is unnecessary for us to decide any issue concerning paraphilia NOS, because we need not decide whether there was legally sufficient evidence that Kenneth T. had a condition "that predispose[d] him . . . to the commission of conduct constituting a sex offense" within the meaning of Mental Hygiene Law § 10.03 (i). Rather, we hold that, even assuming that mental abnormality was demonstrated to that extent, there was not clear and convincing evidence that Kenneth T. had "serious difficulty in controlling" his sexual misconduct within the meaning of section 10.03 (i).

As evidence that Kenneth T. had serious difficulty in controlling conduct amounting to sex offenses, Dr. Kirschner identified the fact that Kenneth T. carried out both offenses in a way that would allow for identification by his victims, and the fact that he attempted the second rape despite having spent many years in prison for the earlier crime. It is evident that circumstances of this nature are insufficient to show, by clear and convincing evidence, that a person has serious difficulty in controlling his sexual urges within the meaning of Mental Hygiene Law § 10.03 (i). A rapist who killed his victims so that they could not identify him may have serious difficulty controlling his sexual urges. Conversely, one who raped an acquaintance and permitted her to escape may not have serious difficulty controlling his sexual urges within the meaning of article 10. A person who commit-

ted a rape soon after serving a very short sentence for sexual abuse may have serious difficulty in controlling his sexual misconduct. Conversely, one who committed a rape soon after serving a very lengthy sentence may not have serious difficulty controlling his sexual urges. Rather, the rape may be a crime of opportunity, and the defendant willing to risk the prospect of a return to incarceration.

Undoubtedly, sex offenders in general are not notable for their self-control. They are also, in general, not highly risk-averse. But beyond these truisms, it is rarely if ever possible to say, from the facts of a sex offense alone, whether the offender had great difficulty in controlling his urges or simply decided to gratify them, though he knew he was running a significant risk of arrest and imprisonment.

We do not decide on this occasion from what sources sufficient evidence of a serious difficulty controlling sex-offending conduct may arise, but they cannot consist of such meager material as that a sex offender did not make efforts to avoid arrest and re-incarceration. A detailed psychological portrait of a sex offender would doubtless allow an expert to determine the level of control the offender has over his sexual conduct. However, Dr. Kirschner's testimony that Kenneth T. lacked "internal controls such as a conscience that might curb his impulses" is not a basis from which serious difficulty in controlling sexual conduct may be rationally inferred. It is as consistent with a rapist who could control himself but, having strong urges and an impaired conscience, decides to force sex upon someone, as it is with a rapist who cannot control his urges. Even viewed in the light most favorable to the State, this testimony is legally insufficient to support the conclusion that Kenneth T.'s mental conditions resulted in his having serious difficulty in controlling conduct constituting a sex offense.[7] Therefore, the State's petition against Kenneth T. under Mental Hygiene Law article 10 should be dismissed.

## VI.

■ Donald DD.'s appeal presents us with an opportunity to decide a question left open in *Matter of State of New York v*

---

7. A transcript of Dr. Etu's testimony at the probable cause hearing was introduced at trial. However, we do not consider Dr. Etu's bare testimony that Kenneth T. had told him he had "difficulty" controlling his sexual impulses to be sufficient proof that Kenneth T. had serious difficulty controlling his sex-offending conduct within the meaning of Mental Hygiene Law article 10.

*John S.* (23 NY3d 326 [2014]), namely whether a civil commitment under Mental Hygiene Law article 10 may be based solely on a diagnosis of ASPD, together with evidence of sexual crimes.[8] We hold that it cannot.

The United States Supreme Court, in its rulings upholding a Kansas civil confinement statute against constitutional challenge (*see Kansas v Hendricks*, 521 US 346 [1997]; *Kansas v Crane*, 534 US 407 [2002]), has held that as a matter of substantive due process the evidence of a respondent's "serious difficulty in controlling behavior . . . when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment *from the dangerous but typical recidivist convicted in an ordinary criminal case*" (*Crane*, 534 US at 413 [emphasis added]; *see also Hendricks*, 521 US at 360). "That distinction is necessary lest 'civil commitment' become a 'mechanism for retribution or general deterrence'—functions properly those of criminal law, not civil commitment" (*Crane*, 534 US at 412, quoting *Hendricks*, 521 US at 373 [Kennedy, J., concurring]). We must interpret the Mental Hygiene Law article 10 statute on the assumption that it accords with these constitutional requirements.

In his testimony in the *Kenneth T.* trial, the State's expert Dr. Kirschner said that the proportion of people currently in prison (or who have been imprisoned) who could be diagnosed with ASPD is "probably about as high as 80 percent." The Supreme Court and other courts have postulated figures ranging from 40% to 70% (*see e.g. Crane*, 534 US at 412, citing P. Moran, *The Epidemiology of Antisocial Personality Disorder*, 34 Soc Psychiatry & Psychiatric Epidemiology 231, 234 [1999] [40-60% of male prison population diagnosable with ASPD]; *United States v Wilkinson*, 646 F Supp 2d 194, 209 [D Mass 2009], citing Jack Vognsen & Amy Phenix, *Antisocial Personality Disorder is Not Enough: A Reply to Sreenivasan, Weinberger, and Garrick*, 32 J Am Acad Psychiatry L 440, 442 [Dec. 2004] [50-70%]).

---

**8.** It is necessary to discuss our ruling in *John S.* briefly. The Court did not address, in that appeal, the question whether a civil commitment under Mental Hygiene Law article 10 may be based solely on a diagnosis of ASPD and evidence of sex crimes, because a majority of the Court concluded that John S. had not argued that it may not. Consequently, our decision was limited to the question of legal sufficiency.

These statistics are compelling. A diagnosis of ASPD alone—that is, when the ASPD diagnosis is not accompanied by a diagnosis of any other condition, disease or disorder alleged to constitute a mental abnormality—simply does not distinguish the sex offender whose mental abnormality subjects him to civil commitment from the typical recidivist convicted in an ordinary criminal case. ASPD "means little more than a deep-seated tendency to commit crimes" (*Shannon S.*, 20 NY3d at 110 [Smith, J., dissenting, joined by Lippman, Ch. J., and Pigott, J.]). Its use in civil confinement proceedings, as the single diagnosis underlying a finding of mental abnormality as defined by Mental Hygiene Law article 10, proves no sexual abnormality. It therefore cannot be the sole diagnosis that grounds such a finding.

We believe that an ASPD diagnosis has so little relevance to the controlling legal criteria of Mental Hygiene Law § 10.03 (i) that it cannot be relied upon to show mental abnormality for article 10 purposes. As Donald DD.'s counsel expressed the objection, ASPD is "not a sexual disorder." Our conclusion is not based on research that is outside of the record, or our own armchair psychology, or even common sense (though all of these point in the same direction). Instead, we base it on the expert testimony in the appeals before us.

The State's expert in the *Kenneth T.* case, Dr. Kirschner, testified that ASPD does not "in and of itself" show mental abnormality as defined by Mental Hygiene Law article 10. Dr. Hamill, the State's expert in *Donald DD.*, conceded that ASPD does not "in and of itself predispose a person to commit conduct constituting a sex offense," noting, along with his co-witness, that a very small proportion—7%—of individuals with ASPD are convicted of a sexual offense. Dr. Plaud, testifying for Donald DD., opined that while ASPD can act "in combination with . . . a diagnosable sexual disorder" to produce a potent abnormal condition, it cannot "in and of itself . . . predict sexual impulse control."

We do not believe that the experts were merely stating the obvious truth that a diagnosis of ASPD without any evidence of sexual crimes is insufficient to show mental abnormality. Rather, it is clear that the experts—even experts whose usual role is to testify that a respondent suffers from a mental abnormality for article 10 purposes—agree, when pressed, that ASPD alone is not a "condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that

*predisposes him or her to the commission of conduct constituting a sex offense* and that results in that person having serious difficulty in controlling such conduct" (Mental Hygiene Law § 10.03 [i] [emphasis added]).

Our conclusion is *not* that ASPD is in itself an unreliable diagnosis rejected by the psychiatric profession. ASPD is not analogous to the diagnoses we considered hypothetically in *Shannon S.* that are "premised on such scant or untested evidence and . . . so devoid of content, or so near-universal in their rejection by mental health professionals, as to be violative of constitutional due process" (*Shannon S.*, 20 NY3d at 106-107 [internal quotation marks and brackets omitted]). The problem is that ASPD establishes only a general tendency toward criminality, and has no necessary relationship to a difficulty in controlling one's sexual behavior.

Finally, our conclusion does not conflict with the holding in *Shannon S.* The diagnosis of paraphilia NOS, whatever its strength or weakness as an evidentiary matter, is, at the very least, potentially relevant to a finding of predisposition to conduct constituting a sex offense. The same is not true of ASPD.

For the reasons stated above, Supreme Court erred in using an ASPD diagnosis, together with testimony concerning Donald DD.'s sex crimes, but without evidence of some independent mental abnormality diagnosis, to ground a finding of mental abnormality within the meaning of Mental Hygiene Law article 10.

Accordingly, in each appeal, the order of the Appellate Division should be reversed, without costs, and the petition dismissed.

GRAFFEO, J. (dissenting in *Donald DD.* and concurring in *Kenneth T.*). In *Matter of State of New York v Donald DD.* we are presented with a jury verdict, rendered after a Mental Hygiene Law article 10 trial, determining that Donald DD. suffered from a mental abnormality. The diagnosis proffered by experts to support this finding was antisocial personality disorder (ASPD). I believe that ASPD may be a viable predicate for a determination of mental abnormality in certain cases since such a diagnosis is consistent with the statutory definition and its use in the article 10 context does not offend principles of substantive due process. I therefore dissent in *Matter of State of New York v Donald DD.*

A related issue is presented in *Matter of State of New York v Kenneth T.* Following a bench trial, Kenneth T. was found to have a mental abnormality. The State's expert diagnosed Kenneth T. with ASPD and paraphilia not otherwise specified (NOS), based on his alleged attraction to nonconsenting partners. I agree with the majority that the State did not present legally sufficient evidence to support the finding of a mental abnormality in this case, but I rely on different grounds for the reversal.

## I.

In 2007, the legislature enacted the Sex Offender Management and Treatment Act (SOMTA) as part of "comprehensive reforms to enhance public safety" by authorizing the civil management of sex offenders (Senate Introducer's Mem in Support, Bill Jacket, L 2007, ch 7 at 15). SOMTA was the result of a legislative determination that "[c]ivil and criminal processes have distinct but overlapping goals, and both should be part of an integrated approach that is based on evolving scientific understanding, flexible enough to respond to current needs of individual [sex] offenders, and sufficient to provide meaningful treatment and to protect the public" (Mental Hygiene Law § 10.01 [a]). To that end, the legislature formulated a two-tiered civil management scheme for certain recidivistic sex offenders that "pose a danger to society" due to "mental abnormalities that predispose them to engage in repeated sex offenses" (*id.* § 10.01 [a], [b], [c]).

In an effort to balance the significant civil liberties and treatment needs of sex offenders with the State's interest in protecting potential victims and preventing sexual assaults, Mental Hygiene Law article 10 contains a detailed procedure for the evaluation of detained sex offenders by mental health professionals before release from incarceration. The Office of Mental Health (OMH) initiates a case review of high risk offenders to assess whether any should be recommended for treatment in the community or civil commitment (*see id.* § 10.05 [a], [b], [d], [e]). Two levels of case review by qualified personnel are undertaken, which usually includes a psychiatric examination of the candidate, to identify sex offenders who may have a mental abnormality (*see id.* § 10.05 [d]-[f]). If the candidate is deemed eligible for civil management, OMH notifies the offender of this status (*see id.* § 10.05 [g]). OMH also submits its recommendation to the Attorney General's Office, which may, in its discre-

tion, file a petition seeking civil management of the offender (*see id.* §§ 10.05 [g]; 10.06 [a]). If a petition is filed, the candidate for civil commitment receives appointed counsel and, within 30 days, the court holds a hearing to determine whether there is probable cause to believe that the offender requires civil management (*id.* § 10.06 [c], [g], [k]). In the event that probable cause is found, a jury ultimately resolves the question "whether the respondent is a detained sex offender who suffers from a mental abnormality" (*id.* § 10.07 [a]).[1] Thus, the statutory scheme requires that OMH, the Attorney General's Office, and a jury determine, as a threshold matter, that a sex offender suffers from a mental abnormality before that individual may be subjected to any category of civil management.

Following a finding of mental abnormality and after the presentation of additional evidence, the court considers which of two available dispositions is appropriate: (1) strict and intensive supervision and treatment (SIST) or (2) civil confinement in an OMH facility (*see id.* § 10.07 [f]; *Matter of State of New York v Nelson D.*, 22 NY3d 233, 238 [2013]). An offender ordered to participate in SIST returns to the community under the supervision of parole officers and must abide by specified conditions and comply with a course of treatment prescribed by the individual's treating medical professional (*see* Mental Hygiene Law § 10.11 [a]).[2]

If the court determines, by clear and convincing evidence, that the individual is a "[d]angerous sex offender requiring confinement," it must order the person confined to a secure treatment facility (*id.* § 10.03 [e]; *see id.* § 10.07 [f]). In these cases, the court must find that the offender's mental abnormality involves "such a strong predispostion to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined" (*id.* §§ 10.03 [e]; 10.07 [f]).

Neither disposition, however, terminates the court's review of an offender's civil management program. An offender may petition the court for discharge at any time and is entitled to an annual review and an evidentiary hearing at least once each year

---

1. A sex offender may waive the right to have mental abnormality determined by a jury and elect a non-jury trial (*see* Mental Hygiene Law § 10.07 [d]).

2. Examples of these conditions include electronic monitoring, polygraph monitoring, residency limitations, prohibition of contact with past or potential victims and parole supervision (*see* Mental Hygiene Law § 10.11).

(*see id.* § 10.09). These safeguards are designed to ensure that only persons who continue to suffer from mental abnormalities and cannot control their sexual misconduct remain subject to civil management.

I now turn to the cases before us.

## II.

In *Matter of State of New York v Donald DD.*, the majority holds that a detained sex offender cannot be subjected to civil management solely because the individual is diagnosed as suffering from antisocial personality disorder (ASPD) (*see* majority op at 188-191). I agree with this statement. The State cannot civilly confine or supervise someone under article 10 of the Mental Hygiene Law simply because that person has been diagnosed with a disorder or condition, paraphiliac or otherwise. Rather, under the Mental Hygiene Law and principles of due process, the State can only civilly manage a sex offender who has a mental abnormality, which requires not just the diagnosis of a predicate disorder but also proof that the disorder predisposes the offender to commit sexual misconduct related to serious difficulty controlling such behavior (*see* Mental Hygiene Law § 10.03 [i]).

As I read the majority's opinion, it is declaring that because ASPD does not always predispose an individual to commit sex crimes, ASPD can never qualify as a predicate disorder in a civil management proceeding. The fundamental flaw in this view is that it equates a "congenital or acquired condition, disease or disorder" with a "mental abnormality," thereby requiring that the predicate disorder itself inherently include the additional predisposition and impulse control elements of Mental Hygiene Law § 10.03 (i) (*see* majority op at 177, 190-191). This interpretation directly conflicts with the language of the statute and unduly narrows the definition of mental abnormality in a manner that principles of substantive due process do not require.

I begin my analysis with the federal case law that has served as the backdrop to the definition of "mental abnormality" in Mental Hygiene Law § 10.03 (i). In *Kansas v Hendricks*, the United States Supreme Court upheld a statute providing for the civil confinement of sexually violent predators who suffered from a "mental abnormality," the definition of which was similar to that which was subsequently enacted in Mental Hygiene Law § 10.03 (i) (521 US 346, 352 [1997]). In rejecting a substantive due process challenge to the Kansas statute, the Supreme

Court recognized that legal definitions of terms such as mental abnormality "need not mirror those advanced by the medical profession" (*id.* at 359). The Court therefore concluded that the civil confinement statute satisfied due process requirements because it did not predicate civil confinement on a finding of dangerousness alone but also required "proof of some additional factor, such as a . . . 'mental abnormality' " that made it difficult for an offender to control dangerous sexual behavior (*id.* at 358-359). As applied to the facts in *Hendricks*, the Court held that the offender's "admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguish[ed] [him] from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings" (*id.* at 360).

Later, in *Kansas v Crane* (534 US 407 [2002]), the United States Supreme Court again reviewed Kansas's confinement statute. In addressing a constitutional challenge, the Supreme Court clarified that, although a State must connect a mental condition and dangerousness finding to an inability to control sexual behavior, the State need not prove that a sex offender lacks total control over the offensive conduct (*see id.* at 410-413). A "serious difficulty in controlling behavior," the Court postulated, can be adequate "when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, . . . to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case" (*id.* at 413). Significantly, the Court emphasized that "the States retain considerable leeway in defining the mental abnormalities and *personality disorders* that make an individual eligible for commitment" (*id.* [emphasis added]).

The adoption of New York's civil management scheme reflects this federal precedent. The statute requires that all offenders subject to civil management, including SIST, must be found to have a mental abnormality as a threshold qualification. Mental Hygiene Law § 10.03 (i) defines a mental abnormality as

> "a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct

constituting a sex offense and that results in that person having serious difficulty in controlling such conduct."

Article 10 authorizes civil confinement only of those sex offenders whose "mental abnormality" involves such a strong disposition to commit sexual misconduct and inability to control behavior that the person is dangerous to society (Mental Hygiene Law §§ 10.03 [e]; 10.07 [f]). Drawing from *Hendricks* and *Crane,* the statutory structure does not run afoul of substantive due process because it requires the State to prove that the individual is dangerous, and the dangerousness must be coupled with a mental abnormality, which—by definition—incorporates a requirement that the offender have serious difficulty with behavioral control. Thus, where the State's evidence conforms to the statutory definition of a mental abnormality, i.e., the State shows that the offender suffers from any "congenital or acquired condition, disease or disorder" that predisposes the person to sexual misconduct and results in difficulty controlling sexual urges, due process is satisfied and the offender may be subjected to either SIST or civil confinement depending on the risk of danger to the community (*id.* § 10.03 [i]).

The majority concludes that ASPD "cannot be used to support a finding that [an offender] has a mental abnormality . . . when it is not accompanied by any other diagnosis of mental abnormality" (majority op at 177). The obvious flaw in this position is that a "congenital or acquired . . . disorder" is, under the language of Mental Hygiene Law § 10.03 (i), only one element of a mental abnormality finding—not the equivalent thereof. In conflating the predicate disorder with the mental abnormality, the majority implicitly injects a requirement that the underlying disorder be "sexually-related" into Mental Hygiene Law § 10.03 (i) on the mistaken premise that such a requirement is necessary to distinguish an offender subject to civil management from a "typical recidivist convicted in an ordinary criminal case" (majority op at 189). Neither the plain language of the statute nor due process compels this conclusion (*see* Mental Hygiene Law § 10.03 [i]; *see generally Crane,* 534 US at 411-414; *Hendricks,* 521 US at 357-360). Instead, it is the effect of the condition—sexually-related or not—on the offender's capacities and ability to control sexual impulses that is key. Where a disorder predisposes a person to sex offending by impacting the individual's cognitive, volitional, or emotional

capacities, it is the interplay of these factors and the concomitant impulse control problems—not the inherently sexual nature of the predicate disorder—that distinguishes an offender subject to management from a "dangerous but typical recidivist" (*Crane*, 534 US at 413). Whether a disorder such as ASPD has the necessary effect on the offender to support a mental abnormality finding must therefore be determined on a case-by-case basis.[3]

The majority's misreading of the Mental Hygiene Law does not simply mean that a sex offender cannot be civilly confined where ASPD is the predicate disorder for a mental abnormality finding, although that is the result in this particular case. Because a finding of mental abnormality is a precursor to a determination of whether SIST is appropriate, the majority necessarily holds that offenders cannot be compelled to participate in SIST on the basis of an ASPD diagnosis. This outcome is unfortunate since the elimination of treatment after release into the community exposes these offenders to a greater risk of re-offending and is detrimental to the protection of the public.

The majority assures us that it is not basing its conclusion that ASPD is per se insufficient as a predicate disorder in the civil management context on research not properly before us or their "own armchair psychology" (majority op at 190). The majority purports to rely on the testimony of the State's experts at Donald DD.'s mental abnormality trial (*see* majority op at 190). Dr. Hamill did concede that "ASPD does not 'in and of itself predispose a person to commit conduct constituting a sex offense'" (majority op at 184). But the majority's interpretation of this testimony as some type of concession that ASPD may never constitute a condition that predisposes an individual to sex offending is, at best, a mischaracterization of the stated opinion (*see* majority op at 190-191), and reflects its flawed equation of the predicate "disorder" or "condition" to a "mental abnormality" (Mental Hygiene Law § 10.03 [i]). Taking Dr. Hamill's testimony in context, the expert was accurately stating that, absent evidence connecting an ASPD diagnosis to a predisposition for committing sex offenses and lack of control, such diagnosis, like any other, does not satisfy the statutory definition of mental abnormality. By contrast, where the additional mental abnormality elements are present, ASPD may be a valid

---

**3.** As the majority acknowledges (*see* majority op at 191), ASPD is not a diagnosis premised on "junk science" or one that has been uniformly rejected by the mental health community (*see Matter of State of New York v Shannon S.*, 20 NY3d 99, 106 [2012], *cert denied* 568 US —, 133 S Ct 1500 [2013]).

diagnosis in a civil management case. For this reason, Dr. Hamill opined that Donald DD.'s ASPD did predispose him to commit sex offenses and caused him to have serious difficulty controlling his sexual impulses.

With regard to the majority's concern that ASPD is too prevalent a diagnosis to distinguish sex offenders subject to civil management from the mental condition of many others in the prison population, it is the impaired impulse control that provides the necessary distinction. The prevalence of ASPD among non-sex offenders and whether ASPD generally predisposes all who suffer from it to the commission of sex offenses is irrelevant. Mental Hygiene Law § 10.03 (i) and due process require only that the State prove that the predicate disorder—here ASPD—affects the emotional, cognitive, or volitional capacity of the specific offender in such a manner that it predisposes the offender to commit sex offenses and have serious difficulty controlling sexual impulses (see Mental Hygiene Law § 10.03 [i]). In other words, the crucial distinction between other criminal recidivists and those subject to civil management is not whether the two categories of offenders carry a similar diagnosis but whether their mental condition—as evaluated by experts—affects them in such a way that the remaining mandatory elements of a mental abnormality are present.

Reading Mental Hygiene Law § 10.03 (i) within the confines of due process to permit the use of ASPD in the mental hygiene context does not permit the State to use article 10 to unjustly confine vast numbers of persons convicted of sex offenses. Although a certain percentage of the incarcerated may meet the diagnostic criteria for ASPD, the disorder concededly manifests in such a manner as to predispose the individual to the commission of sex offenses in a limited subset of ASPD sufferers (see majority op at 190). Those few who meet the ASPD diagnostic criteria and whose disorder manifests in such a way that the additional elements of a mental abnormality exist are sufficiently distinguishable from recidivists on a broader level. Notably, courts of other states have upheld civil confinement on an ASPD diagnosis standing alone (see Commonwealth v Mazzarino, 81 Mass App Ct 358, 369, 963 NE2d 112, 121 [2012], review denied 462 Mass 1109, 970 NE2d 333 [2012]; In re Civil Commitment of K.J.W., 2012 WL 5372393, *2-3, 2012 NJ Super Unpub LEXIS 2443, *3-7 [App Div 2012]; In re Detention of Shaw, 165 Wash App 1021 [2011]; In re Detention of Barnes, 689 NW2d 455, 459 [Iowa 2004]; In re Commitment of Adams, 223 Wis 2d 60, 65-71,

588 NW2d 336, 338-341 [Ct App 1998]). Despite the majority's dissatisfaction with the implications of article 10, our analysis must be based on the law as the legislature and Governor saw fit to enact because the statute—and the viability of ASPD as a predicate disorder under the statutory definition of mental abnormality—comports with due process. Consequently, where the State presents clear and convincing evidence through expert testimony linking an offender's ASPD to a predisposition for the commission of sex offenses and an inability to control his or her conduct, the mental abnormality finding should be upheld.

Examined in this light, the State's evidence in Donald DD.'s case was clearly legally sufficient (see Matter of State of New York v John S., 23 NY3d 326, 349 [2014], rearg denied 24 NY3d 933 [2014]). Three psychologists, Drs. Hamill, Kunkle, and Cederbaum, diagnosed Donald DD. with ASPD and explained their basis for that diagnosis, namely Donald DD.'s criminal history, violent conduct, inability to maintain consistent long-term employment, failure to show remorse, and tendency to blame his victims. Although Drs. Kunkle and Hamill agreed that a diagnosis of ASPD does not automatically mean that an individual suffers from a mental abnormality, in Donald DD.'s case, they concluded that ASPD predisposed him to commit sex offenses because it caused him to act out in a sexually aggressive manner against victims ranging in age. In addition, Dr. Hamill testified that Donald DD.'s ASPD affected his cognition and "emotionality" so that he had "cognitive distortions," which resulted in his inability to understand that his sexual misconduct was improper and allowed him to "give [himself] permission to act" in a sexually offensive manner. Drs. Kunkle and Hamill also testified that Donald DD. had serious difficulty controlling his sexual urges as a result of his ASPD, as evidenced by the early onset of his illegal sexual conduct, and his commission of sexual offenses while married and under parole or probation supervision. And, although Donald DD. presented an expert witness who disputed the State's proof, this conflicting testimony presented a question for the factfinder to resolve. Accordingly, on this record, I would uphold the jury's mental abnormality finding.

### III.

Turning to the second case before us, in Matter of State of New York v Kenneth T., I agree that it is necessary to reverse the finding of mental abnormality on legal insufficiency

grounds. I do not, however, concur with the majority that the State failed to present legally sufficient evidence to demonstrate that Kenneth T. had serious difficulty controlling his sexual impulses.

The evidence proffered to the factfinder at Kenneth T.'s trial established that he committed his first violent sex offense while on parole for a non-sex offense crime, during daylight hours and in an area that he frequented. Dr. Kirschner opined that these circumstances indicated that Kenneth T. had difficulty controlling his impulses because the likelihood that he would be recognized in an area that he frequented "did not serve as a deterrent," as it perhaps would to a person who simply saw an opportunity to act out with impunity. Thus, Dr. Kirschner opined that Kenneth T. lacks sufficient impulse control and "has very little braking mechanism to stop his impulses once [they are] set in motion."

The circumstances of Kenneth T.'s second offense also support Dr. Kirschner's conclusion that Kenneth T. had serious difficulty controlling his sexual urges. Kenneth T. committed his second sexual act a mere 13 months after being released from 17 years of incarceration, which was apparently the consequence of his failure to curb his sexual impulses—he attempted to rape a female student who could easily identify him as an employee of the university that she attended. This offense took place in a public parking lot in the vicinity of Kenneth T.'s home. At the time, Kenneth T. was on parole and subject to sex offender registration. Dr. Kirschner testified that the circumstances of this sexual attack against someone who was familiar with him, and in a public place where he could be identified by a passerby who recognized him, demonstrated Kenneth T.'s "[p]oor impulse control" and that his ASPD affected his "volitional capacity."

The majority concludes that this evidence is legally insufficient to support a finding that Kenneth T. had "serious difficulty in controlling his sexual misconduct" because it is just as likely that he consciously chose to disregard his impulses (see majority op at 188). This rationale establishes an impossible standard. The majority fails to indicate exactly what other type of evidence a factfinder may rely upon to determine an offender's inability to control sexual behaviors, short of a clear admission from the offender regarding a lack of control over urges (see majority op at 188). Indeed, Dr. Etu reported that Kenneth T. admitted that he had "difficulty controlling his sexual impulses" (see majority op at 188 n 7). Contrary to the

majority's position, the circumstances surrounding the recurrence of criminal sexual conduct despite the prior imposition of severe sanctions for similar behavior are factors that are directly relevant to evaluating whether an offender struggles to control his sexual conduct (*see John S.*, 23 NY3d at 349; *Matter of State of New York v Shannon S.*, 20 NY3d 99, 108 [2012], *cert denied* 568 US —, 133 S Ct 1500 [2013]). I therefore cannot agree that the evidence was legally insufficient to demonstrate that Kenneth T. had serious difficulty controlling his behavior. But my analysis does not end here.

I conclude that the determination of mental abnormality must be reversed since the State failed to present legally sufficient evidence to support its proffered diagnosis of parapahilia NOS, nonconsenting partners. Like the majority (*see* majority op at 186-187), I do not believe that resolution of Kenneth T.'s case requires us to revisit our holding in *Matter of State of New York v Shannon S.* (20 NY3d 99 [2012]). There, a majority of this Court rejected the respondent's challenge to the viability of paraphilia NOS as a predicate condition, holding that a condition need not be listed in the Diagnostic and Statistical Manual of Mental Disorders to so qualify (*see id.* at 106). Further, we explained that "[a]ny professional debate over the viability and reliability" of predicate conditions is an issue properly reserved for resolution by the factfinder (*id.* at 107). Those same principles apply in this case, but the State must present "an adequate record" for the factfinder and reviewing courts to assess the applicability of the asserted diagnosis (*id.*). In this respect, assuming without deciding that paraphilia NOS, nonconsenting, is a valid diagnosis, the evidence presented was insufficient.

At Kenneth T.'s trial, Dr. Kirschner testified that paraphilia NOS generally involved "sexual fantasies, urges or behaviors directed . . . at inanimate objects or non-consenting partners or minors" and that Kenneth T., specifically, "has sexual fantasies, urges or behaviors involving non-consenting partners." Although Dr. Kirschner claimed that he could "infer[ ]" that Kenneth T. had paraphilia NOS, nonconsenting, from "the evidence or the record," he also stated that he was "not sure" he would infer that Kenneth T. was aroused by the nonconsensual nature of his sexual misconduct. Dr. Kirschner admitted that he did not believe that it "really . . . matter[ed]" whether Kenneth T.'s sexual crimes were the result of a paraphilia and he conceded that, on these facts, he could not distinguish Kenneth T. from a rapist motivated by a need for power and control

rather than paraphiliac urges. In his view, whether Kenneth T.'s predisposition to commit sex crimes was caused by a "congenital or acquired condition, disease or disorder" was irrelevant (Mental Hygiene Law § 10.03 [i]). According to his testimony, paraphilia NOS, nonconsenting, may be diagnosed through evidence of the offender's fantasies and feelings related specifically to the nonconsensual aspect of an offense. Any such proof, however, was admittedly lacking here. Because Dr. Kirschner grounded his opinion that Kenneth T. suffered from a mental abnormality on both the ASPD and paraphilia NOS diagnoses and the two cannot be separated based on the testimony adduced, the mental abnormality finding must be reversed.

<u>IV.</u>

For the foregoing reasons, I respectfully dissent in *Matter of State of New York v Donald DD.* and concur in result only in *Matter of State of New York v Kenneth T.*

Chief Judge LIPPMAN and Judges SMITH and RIVERA concur; Judge GRAFFEO dissents in an opinion in which Judges READ and ABDUS-SALAAM concur.

In *Matter of State of New York v Donald DD.*: Order reversed, without costs, and petition dismissed.

Chief Judge LIPPMAN and Judges SMITH and RIVERA concur; Judge GRAFFEO concurs in an opinion in which Judges READ and ABDUS-SALAAM concur.

In *Matter of State of New York v Kenneth T.*: Order reversed, without costs, and petition dismissed.