This memorandum is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------

No. 102
In the Matter of State of New
York,
        Respondent,
    v.
Floyd Y. (Anonymous),
        Appellant.

Alexandra H. Keeling, for appellant.
Matthew W. Grieco, for respondent.

MEMORANDUM:

The judgment appealed from and the order of the

Appellate Division brought up for review should be affirmed,

without costs.

Considering the evidence "in the light most favorable

to the State" (Matter of State of New York v John S., 23 NY3d

- 1 -

326, 348 [2014]), as we must, the evidence at respondent's retrial (see Matter of State of New York v Floyd Y., 22 NY3d 95, 111 [2013]) was legally sufficient to establish by clear and convincing evidence that he had "serious difficulty in controlling" his sexual conduct within the meaning of Mental Hygiene Law § 10.03 (i).

The State's expert witness testified, among other things, that he diagnosed respondent with pedophilia and antisocial personality disorder (ASPD), as well as substance abuse disorders. In the expert's opinion, respondent's "combination of a pedophilic disorder with [ASPD] . . . create[d] a very toxic mixture in the sense that [respondent] [wa]s more likely to act on the urges towards children and not feel remorse." The witness's testimony was supported by evidence from the relevant scientific community. As respondent's expert witness conceded, the American Psychiatric Association's Manual of Mental Disorders states that there is "an interaction between pedophilia and [ASPD], such that males with both traits are more likely to act out sexually with children" (see American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 699 [5th ed 2013]).

The jury also heard that during sex offender treatment, respondent described his struggle with pedophilia by saying he had experienced sexual desires toward his preteen stepdaughter, which he had been "fighting for a significant period of time,"

until "he gave in to them."  There was also testimony from respondent's expert witness that during an interview respondent had summarized the urgency of his sexual desires by saying, "I want what I want when I want it."

Additionally, the State's expert testified that respondent had made minimal progress in treatment for his pedophilic disorder, and had been removed from treatment "because his behavior was deviant and very difficult to manage. . . . [A]s recently as 2013 and 2014 . . . he wasn't really involved [in treatment] or wasn't attending or had a negative and hostile attitude."  The expert opined that, because of this failure to cooperate with sex offender treatment, respondent had not developed the "cognitive skills" necessary to manage his pedophilia.  He had no "viable relapse prevention plan" (compare Matter of State of New York v Michael M., 24 NY3d 649, 655 [2014] [describing "tools" by means of which a Mental Hygiene Law article 10 respondent subject to "strict and intensive supervision and treatment" was "learning to control" his sexual urges]).  The expert further testified that respondent exhibited cognitive distortions about what constitutes consensual sex. Moreover, respondent over the years minimized or denied his offending behavior, exhibiting a lack of remorse for his actions, which impaired his ability to control his desires.

We conclude that a rational jury could have found -- on the basis of respondent's particular diagnoses and cognitive

deficiencies, his own admissions, and his cavalier attitude toward sex offender treatment -- that respondent had "serious difficulty in controlling" his sexual conduct.

Finally, we note that no expert at respondent's trial testified that a diagnosis of pedophilia alone would demonstrate "serious difficulty in controlling" sexual conduct, and the State concedes that it has never "advocated for any such rule."  In the present case, by contrast, there was "detailed testimony" (Matter of State of New York v Dennis K., 27 NY3d 718, 752 [2016]; see generally Matter of State of New York v Donald DD., 24 NY3d 174, 188 [2014]) about the manner in which respondent's multiple psychiatric disorders collectively resulted in his having "serious difficulty in controlling" his sexual conduct.

We have considered respondent's remaining contentions and they lack merit.

Matter of State of New York v Floyd Y.

No. 102

WILSON, J.(dissenting) :

> Oh Thou, who didst with Pitfall and with Gin
>
> Beset the Road I was to wander in,
>
> Thou will not with Predestination round
>
> Enmesh me, and impute my Fall to Sin?

Rubáiyát of Omar Khayyám

I respectfully dissent.

Floyd Y. has a tortuous history. In sum, sentenced to a term of four to eight years, he was confined for fifteen years, only four of which were his term of imprisonment, and is now released under a program of "Strict and Intensive Supervision and Treatment" (SIST). Make no mistake, he appears to be a person who has done many bad things, some of which were proved beyond a reasonable doubt, the others not. The issue here, though, is not whether Floyd Y. is good or bad, or whether he spent too little time in prison, or whether he will commit some future crime if released from SIST. To justify his continued civil management "on the fiction that he has some sort of mental condition other than a tendency to commit the crimes for which he was convicted

- 1 -

(and has served his time) is and should be constitutionally unacceptable" (Matter of State of New York v Shannon S., 20 NY3d 99, 112 [2012] [Smith, J. dissenting]).  We now have ten years of experience with article 10, and the truth that emerges from our decisions is that the question of whether human behavior is volitional or predetermined is no more tractable that it was thousands of years ago.

Between 1996 and 1998, Floyd Y. sexually molested his two young stepchildren.  In 2001, he was sentenced to a term of four to eight years in prison for those offenses.  In 2005, he was released from prison, but his confinement was continued pursuant to article 9 of the Mental Health Law.  In 2006, this Court held that his confinement under article 9 was unlawful (State of N.Y. ex rel. Harkavy v Consilvio, 7 NY3d 607 [2006]).[1]  In response to Harkavy, the legislature adopted article 10 of the Mental Hygiene Law, which provides for the civil commitment of sex offenders who have a "mental abnormality," which is defined as a "condition, disease or disorder . . . that [1] predisposes [a person] to the commission of conduct constituting a sex offense" and that "[2] results in that person having serious

_____

[1] We held that if the State wished to continue the civil confinement of an inmate who would otherwise be released, the State needed to proceed under Correction Law § 402, which, among other things, requires the prison superintendent to petition the court to appoint two independent psychiatrists to evaluate the inmate; article 9 of the Mental Law lacks that and other procedural safeguards (id. at 613).

difficulty in controlling that conduct" (Mental Hygiene Law §
10.03 [i]).[2]

Upon enactment of article 10, the State brought a
petition seeking to continue Floyd Y.'s commitment as a sex
offender suffering from a mental abnormality.  The jury found
that he had a mental abnormality, and the trial court ordered
that he remain confined.  In Matter of State of New York v Floyd
Y. (22 NY3d 95 [2013]), we reversed and ordered a new trial,
holding that the State had used its expert as a conduit for
inadmissible hearsay prejudicial to Floyd Y.  He remained
confined pending the new trial, which was held in 2015.  The jury
again found that Floyd Y. suffered from a mental abnormality, but
the trial court held that the evidence was insufficient to show
that Floyd Y. had "serious difficulty in controlling" his sex
offending, relying principally on our decision in Matter of State
of New York v Donald DD. (24 NY3d 174 [2014]), in which we
rejected the opinion of the same psychologist who had testified
as to Floyd Y.'s mental abnormality, Dr. Stuart Kirschner (46
Misc 3d 1225[A], 2015 NY Slip Op [Sup Ct. NY County 2015]).  The
Appellate Division reversed, concluding the record contained
sufficient evidence to satisfy article 10 (135 AD3d 70 [1st Dept

---

[2] Article 10 parrots the words of Supreme Court precedent.
A finding of a "mental abnormality" which causes a "lack of
control" over offending behavior satisfies the substantive due
process rights of a sex offender whom the state is seeking to
civilly manage (Kansas v Hendricks, 521 US 346 [1997]; Kansas v
Crane, 534 US 407 [2002]).

2015]).  Pursuant to a dispositional hearing conducted in Supreme Court before the Appellate Division's reversal, Floyd Y. was determined not to be a "dangerous" sex offender, and therefore is presently released under SIST, instead of confined.

I

So, what is the clear and convincing evidence of Floyd Y.'s serious inability to control his sex offending?  It appears to consist of the following: (1) Dr. Kirschner diagnosed Floyd Y. with pedophilia, antisocial personality disorder (ASPD) and substance abuse disorders, and then relied on a statement in the American Psychiatric Association's Manual of Mental Disorders (DSM-5) noting "an interaction between pedophilia and [ASPD] such that males with both traits are more likely to act out sexually with children"; (2) during sex offender treatment, Floyd Y. said he had struggled with, and ultimately given in to, sexual urges directed at his stepdaughter; (3) Floyd Y. was removed from sex offender treatment because he was difficult; (4) Floyd Y. explained his conduct by saying "I want what I want when I want it"; and (5) he had no viable relapse prevention plan.  In evaluating the sufficiency of this evidence, it is important to keep in mind that the proof must support scientifically valid criteria that can distinguish persons who are to be civilly confined or strictly supervised "from the dangerous but typical recidivist convicted in an ordinary criminal case" (Kansas v Crane, 534 US 407, 413 [2002]).  These observations compiled by

Dr. Kirschner do not constitute clear and convincing proof that Floyd Y.'s mental abnormality causes him to have serious difficulty in controlling his sexual offending.

First, Dr. Kirschner's diagnoses, even if accurate, go to the "mental abnormality" prong. His conclusion as to the "serious difficulty in controlling" prong rests on a generalization that may or may not be true as to Floyd Y. The proof required is that Floyd Y.'s mental abnormality causes him serious difficulty in controlling his sexual offending behavior, not that people with his diagnoses sometimes, generally, or more often than not, have such serious difficulty. Observed differences in behavior do not answer the question of whether such behavior is volitional or, instead, not volitional and caused by a mental abnormality. Moreover, the law does not allow proof of individual liability by evidence of the propensity of a group of which the individual is a member. As a further matter, the substance abuse and pedophilia diagnoses were based on stale information: there was no evidence that Floyd Y. had used drugs or alcohol in the past 20 years, and the pedophilia diagnosis was largely based on the crime of incarceration (nearly 20 years before his second article 10 trial) and statements he made "early on" during sex offender treatment.[3] Nothing in those diagnoses

---

[3] The only recent psychological interview was conducted by Dr. Singer; Dr. Kirschner reviewed his report and testified that Floyd Y. "feels remorse" for molesting his stepchildren, and recognizes "it is something that he should not have done."

allows us to say that Floyd Y. has a mental abnormality that results in an inability to control his sexually offending behavior, and is not (or was not) instead a recidivist rapist with a substance abuse problem.

Second, Floyd Y.'s statements "early on" in sex offender treatment, to the effect that he had sexual urges towards his young stepdaughter "for a significant period of time," to which he ultimately gave in, may establish pedophilia (all his other documented sexual conduct involved females too old including, inter alia, his own stepmother, to fit within the definition of pedophilia), but, as the majority acknowledges, a diagnosis of pedophilia does not establish a present inability to control sexual offending, and coupling it with ASPD (which Dr. Kirschner estimates that 80% of the prison population has) and drug abuse (same) again does not prove that Floyd Y.'s mental abnormality causes him serious difficulty in controlling his sexually offending behavior.[4]  His admission that he did in fact

---

[4] Contrary to the Appellate Division's statement that an element of impulse control difficulty is inherent to pedophilia, neither ASPD nor pedophilia contains such an element.  Dr. Kirschner defined a pedophile as an "individual [who] has intense sexual urges, fantasies or behaviors involving prepubescent children and that the person has either acted on these urges or it causes the individual significant distress and problems in his functioning in his life, occupational, educational, vocational, social, etcetera.  And that the problem exists for at least six months."  As we stated in Kenneth T., the existence of urges and acting upon those urges could indicate a lack of control or it could just as simply indicate a choice to gratify those urges (24 NY3d at 188).

have an urge before he committed the crime (a fact that was probably assumed) was interpreted to mean that since he did in fact commit the crime, he was unable to control his urges (which, during the admission, he said he had in fact controlled for a significant period of time).  This reasoning is circular, and reverts back to relying almost exclusively on the underlying criminal history for which Floyd Y. has already been to prison.  In Kenneth T. we noted that it is "rarely if ever possible to say, from the facts of a sex offense alone" whether the offender had difficulty controlling his behavior (24 NY3d at 188).

Third, the record evidence concerning Floyd Y.'s sex offender treatment shows the following.  He completed the sex offender treatment program while serving his term of imprisonment, and because of "dose effects" associated with his age, he had "sufficient sex offender specific treatment." Following his (unlawful) transfer to a psychiatric hospital in 2005, Floyd Y. "made moderate gains" but "more recently . . . made minimal gains."  After our decision reversing his first article 10 trial, "he wasn't really involved or wasn't attending or had a negative and hostile attitude."  The examples given were that he "might hang shirts to cover his window," "fought with other residen[ts] or postured to fight with them," and "says . . . he doesn't need to get involved because he is gonna be released in the near future anyway."  It would be very hard indeed to conclude that these examples evidence anything other

than expected behavior by someone who believes he has been unlawfully confined in a psychiatric facility for 11 years. Moreover, failure to participate in treatment is at least equally consistent with volitional behavior as it is with a mental abnormality causing serious control difficulties.

Fourth, his "I want what I want when I want it" statement was made more than a decade ago. Doubtless countless celebrities, investment bankers, sports stars, politicians and perhaps even lawyers and psychiatrists have felt the same way.[5] Although not admirable, such sentiments are regrettably mainstream enough to fail as evidence of a mental abnormality causing a lack of control.

Fifth, a sex offender's lack of a relapse prevention plan does not help us distinguish between those who are mere

---

[5] "I want what I want when I want it" also happens to be the title of a song opening the second act of the operetta Mademoiselle Modiste, penned by Henry Blossom and Victor Herbert, debuting in 1905. Cf., e.g., John Lennon & Paul McCartney, I Want You (She's So Heavy) (1969) ("I want you, I want you so bad it's driving me mad, it's driving me mad"); Mick Ralphs, Can't Get Enough of Your Love (1974) ("Well I take whatever I want, and baby, I want you"); Isaac Hayes, David Porter & Mabon Hodges, I Take What I Want (1966) ("I take what I want, I'm a bad go-getter, yeah, yes, I am. I'm never a loser and I'm never a quitter yet, oh, no. 'Cause I take what I want, baby, I want you, yeah, you"); Kit Yarrow, Decoding the New Consumer Mind (2014) (describing modern consumers as possessed by IWWIWWIWI); Leslie Bricusse, Anthony Newley & Walter Scharf, I Want it Now!, Willy Wonka and the Chocolate Factory (1971) ("I want the whole works! Presents and prizes and sweets and surprises in all shapes and sizes, And now! I don't care how! I want it now!").

recidivists and those who cannot control their offending behavior
because of a mental abnormality.  Granted, a relapse prevention
plan might help either, but its absence does not let us
distinguish one from the other.

In Kenneth T., we remarked on the difficulty of
divining how impulse control fits into the commission of a sex
crime:

> "A rapist who killed his victims so that they
> could not identify him may have serious
> difficulty controlling his sexual urges.
> Conversely, one who raped an acquaintance and
> permitted her to escape may not have serious
> difficulty controlling his sexual urges
> within the meaning of article 10.  A person
> who committed a rape soon after serving a
> very short sentence for sexual abuse may have
> serious difficulty in controlling his sexual
> misconduct.  Conversely, one who committed a
> rape soon after serving a very lengthy
> sentence may not have serious difficulty
> controlling his sexual urges. Rather, the
> rape may be a crime of opportunity, and the
> defendant willing to risk the prospect of a
> return to incarceration"

(24 NY3d at 188).  The American Psychiatric Association, quoted
by the Supreme Court in Crane, made the same point more
succinctly: "The line between an irresistible impulse and an
impulse not resisted is probably no sharper than that between
twilight and dusk" (534 US at 412 [quoting The American
Psychiatric Association, Psychological Evaluations for the
Courts, 200 [2d ed. 1997]]).

Indeed, when creating the requirement that a sex

offender must demonstrate a "lack of control" in order to be committed, the Supreme Court in <u>Crane</u> noted that "we did not give to the phrase 'lack of control' a particularly narrow or technical meaning.  And we recognize that in cases where lack of control is at issue, 'inability to control behavior' will not be demonstrable with mathematical precision.  It is enough to say that there must be proof of serious difficulty in controlling behavior" (534 US at 413).  In an apparent acknowledgment of the fact that this legal requirement was not definable in psychiatric terms, the Court went on to say, "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law" (<u>id.</u>).

In his dissent in <u>Crane</u>, Justice Scalia pointed out the glaring problems with the requirement, writing,

> "I suspect that the reason the Court avoids any elaboration is that elaboration which passes the laugh test is impossible. How is one to frame for a jury the degree of 'inability to control' which, in the particular case, 'the nature of the psychiatric diagnosis, and the severity of the mental abnormality' require? Will it be a percentage ('Ladies and gentlemen of the jury, you may commit Mr. Crane under the SVPA only if you find, beyond a reasonable doubt, that he is 42% unable to control his penchant for sexual violence')? Or a frequency ratio ('Ladies and gentlemen of the jury, you may commit Mr. Crane under the SVPA only if you find, beyond a reasonable doubt, that he is unable to control his penchant for sexual violence 3 times out of 10')? Or merely an

adverb ('Ladies and gentlemen of the jury, you may commit Mr. Crane under the SVPA only if you find, beyond a reasonable doubt, that he is appreciably-or moderately, or substantially, or almost totally-unable to control his penchant for sexual violence')? None of these seems to me satisfactory"

(id. at 423-424 [Scalia, J., dissenting]).

As behavioral experts have opined, "It would seem tautological, and certainly not scientific to argue that the offender has pedophilia because he/she commits sexual acts against children and he/she commits sexual acts against children due to that pedophilic condition. Translating this premise into the control paradigm: the offender lacks the ability to control his/her behavior because the person fails to control that behavior" (Holly A. Miller, et al., Sexually Violent Predator Evaluations: Empirical Evidence, Strategies for Professionals, and Research Directions, 29 L & Human Behavior 1, 43 [Feb. 2005]).  When one looks more closely at the testimony of Dr. Kirschner, it becomes apparent that he rests his opinions here on a host of information that fails for the same reason his testimony failed in Kenneth T.: it does not allow him or us to distinguish volitional conduct from conduct caused by a mental abnormality.

## II

The fundamental problem is this: we have no way to know whether the fault lies with ourselves or with our stars.  Why we do what we do dates at least to the disagreement between the

Stoics and Aristotle.  Today, the debate continues, more often framed around brain chemistry and physics than philosophy or religion.  Article 10 asks us to prove the unprovable: a mental abnormality caused me to have serious difficulty controlling my actions, or as Flip Wilson put it, "The devil made me do it."

The legislature enacted article 10 one year after Harkavy, because it determined that "many mentally abnormal sexual offenders may not have the kind of 'mental illness' that is a prerequisite for such a commitment" under the Correction Law (Governor's Program Bill Mem, Bill Jacket, L 2007, Ch 7 at 9-10).  Thus, the legislature sought to expand civil commitment of one type of criminal - sex offenders - to persons who had previously not qualified as in need of commitment under the existing laws.

Days before the legislature passed article 10, the New York State Psychiatric Association sharply criticized the proposed legislation in a letter to Governor Spitzer, writing, "'mental abnormality' as defined is essentially a vague and circular determination that has no scientific or clinical basis" and that "usurps psychiatric terminology to achieve a social and political result" (Bill Jacket, L 2007, Ch 7 at 67).  It continued, "Because 'mental abnormality' has no medical foundation, mental health professionals, including psychiatrists, *have no special expertise in assessing individuals for the presence of 'mental abnormality' as defined in the bill*" (emphasis added) and observed "it is precisely because many

individuals who would be considered a 'dangerous sex offender requiring confinement' under the bill do not fit into the existing statutory scheme for civil commitment of persons (because they do not have a serious mental illness) that the non-psychiatric definition of mental abnormality was created in order to provide a legal basis for civil retention" (id.).

Mental health organizations have criticized such laws as scientifically unsound.  In 1999, the American Psychiatric Association opined that "Sexual predator commitment laws represent a serious assault on the integrity of psychiatry . . . by bending civil commitment to serve essentially nonmedical purposes, sexual predator commitment statutes threaten to undermine the legitimacy of the medical model of commitment" (American Psychiatric Association Task Force, Dangerous Sex Offenders 173 [1999]).

Professor Stephen Morse, an expert on individual agency and the intersection of criminal law and mental health has observed the following about self-control and our ability to measure it:

> "[W]e talk about impulses, the will, and self-control as if these are independent psychological entities that are well-understood and reliably identifiable. But theoretical disarray abounds in psychology; the studies often contradict each other; measures of supposedly the same variable correlate poorly; findings are often based on suspect self-reports; and, most importantly, the studies do not address, and

> folk psychology does not know, whether and to
> what degree people are unable to refrain from
> acting.  Neither in psychology, philosophy,
> nor folk psychology is there a reasonably
> uncontroversial understanding of these
> matters.  Finally, we do not know how mental
> disorder affects self-control in general,
> apart from its more clear role in affecting
> perception and belief, which are variables
> central to rationality."

(Culpability and Control, 142 U Pa L Rev 1587, 1657-1658 [1994]).

Other experts in the field have commented, "[t]here is no

empirical proof that an individual diagnosed with a personality

disorder or paraphilia actually has a neuropsychological

abnormality, or, if present, the degree to which that abnormality

may impair behavioral control," and further, "[n]ot only is there

no method developed by which to assess behavioral control, there

is no clear definition of what is being measured. Any standard

would appear to be more normative than scientific" (Miller, et

al. at 42).

III

The standard's deficiencies have become patent when

courts, including ours, have attempted to apply it in actual

cases.  Even a cursory review of the psychological/psychiatric

testimony in our article 10 cases demonstrates the lack of any

valid scientific method.  Experts before our courts have

testified that a sex offender has a mental abnormality causing a

serious difficulty in control based on the following sorts of

information: (i) commission of a crime in a manner in which it

was likely that the offender would face legal consequences because the victims knew or could easily identify the defendant (Kenneth T., 24 NY3d at 187); (ii) lack of conscience (Floyd Y., 46 Misc 3d 1225[A] at *7); (iii) lack of remorse (id.); (iv) the combination of ASPD and paraphilia NOS (Kenneth T., 24 NY3d at 179); (v) commission of a new sex offense shortly after release from a long prison stay (id. at 187)); (vi) admissions from the perpetrators that they have difficulty ignoring their sexual impulses (id. at 178; Floyd Y., 46 Misc 3d 1225[A] at *7); (vii) ASPD diagnosis (Kenneth T., 24 NY3d at 179; Donald DD. 24 NY3d at 183; Frank P., 126 AD3d 150, 154 [1st Dept 2015]; John S., 23 NY3d 326, 334 [2014]); (viii) a sense of entitlement "that if it's there [the offender] can take it" (Dennis K., 27 NY3d 718, 731 [2016]); (viii) reoffending while in a consensual relationship (id. at 732); (ix) a diagnosis of paraphilia NOS (Frank P., 126 AD3d at 154); (x) offense taking place in a public place (John S., 23 NY3d at 337); (xi) a "historical pattern" of "reoffending after being sanctioned" (John S., 23 NY3d at 338); (xii) failure to participate in sex offender treatment (Floyd Y., 135 AD3d at 76; John S., 23 NY3d at 338); (vviii) a pattern of offending with vulnerable and easily accessible victims (Floyd Y.), among others. Although we have accepted some of these as sufficient evidence when in combination with others, none - apart or in combination - lets us know whose mental abnormality causes serious difficulty in avoiding reoffense, and who is a volitional

recidivist. To be clear, I am not impugning the integrity of the psychiatrists and psychologists who have attempted to provide some testimony that might meet article 10's legal standard; instead, I observe that we in the legislative and judicial branches have erred in uniting psychiatric principles and an impossible legal standard in an unhappy marriage, when the experts themselves have plainly objected.

The nature of this unworkable standard is also apparent in how various pieces of evidence have been interpreted to prove a mental abnormality causing a serious difficulty in control. There is no protection in article 10 against using statements made while participating in sex offender treatment against the offender in later civil commitment proceedings. Conversely, failing to participate fully in sex offender treatment, which undoubtedly requires confession of past offenses, will also be used against the offender.

In many cases, there is no recent evidence of an offender acting out sexually, to show that he currently suffers from a mental abnormality. The undisputed evidence is that the four behavioral violations Floyd Y. received during his incarceration were not for sexual or violent infractions, but for "package and commissary ones . . . really kind of minor stuff." Even though Floyd Y.'s last offense was nearly twenty years ago, and he has had no incidents since then, that evidence is neutralized with the argument that he was confined, either in

prison or civilly in this case, and so his "triggers" were not present.  However, in other cases time in prison has been used as evidence that the offender has been acting out sexually, seemingly indicating that the presence of absence of "triggers" should make little difference (see e.g., Matter of Christopher PP. v State of New York , 151 AD3d 1334, 1337 [3d Dept 2017]).

Experts also frequently testify in these cases without having ever interviewed the offender.  Their opinions are based principally on criminal history (for which the offender has already been incarcerated), statements by the offender (often from sex offender treatment), diagnoses (which are based on criminal history and statements by the offender), and the degree of participation in sex offender treatment.

IV

Article 9 allows for the confinement of mentally ill persons truly in need of confinement.  "If the present sentences for sex offenders are too short, the Legislature should make them longer, but it should not, and constitutionally cannot, simply substitute civil for criminal proceedings as a means of keeping dangerous criminals off the streets" (Shannon S., 20 NY3d at 109 [Smith, J., dissenting]).  Here, the various prior offenses presented to the jury as support for Dr. Kirschner's opinion and, eventually, a determination that Floyd Y. has a mental abnormality that causes him serious difficulty in controlling his sexually offending behavior are: (1) the 1984 attempted rape of

J. (no charges); (2) 1992 rape of S. (69 weekend days in jail); (3) 1994 sexual assault of H. ($250 fine; $45 surcharge); (4) 1998 sexual harassment of M. ($0 fine; $45 surcharge); (5) 1999 sexual molestation of C. (no charges); (6) 1996-1998 molestation of his stepchildren (4 to 8 year sentence).  If the State desired to incarcerate Floyd Y. beyond the 4 to 8 year sentence imposed for his last conviction, it did not have to abandon the prior charges or resolve them for small fines.  His victims are hardly redressed by his belated civil confinement, and timely and full prosecution of those offenses, if justified, may have also prevented some of the subsequent ones.  If unjustified (because the evidence was weak or conflicted), where is the fairness in asking a psychologist to assume their truth?  It is wholly inappropriate and unconstitutional to invent a meaningless legal standard and seek to meet it by repackaging forgone offenses to justify indefinite confinement and strict supervision.

The prosecution and reduction of sex crimes is tremendously important.  However, the stakes of potential indefinite confinement are as high as they come, and require a reformulation of the relevant standards to adhere to the scientific principles and medical methodologies that have governed our civil commitment processes under article 9 and the Correction Law.  Article 10's standard cannot properly distinguish between the typical recidivist of dangerous sexual crimes, for whom we have the criminal justice system, and

something more.  In <u>Kansas v Hendricks</u>, Justice Kennedy observed:
"if it were shown that mental abnormality is too imprecise a
category to offer a solid basis for concluding that civil
detention is justified, our precedents would not suffice to
validate it" (534 US at 412).  It is time to admit that the
emperor has no clothes.  (Whether he could not help himself
remains unknowable.)

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Judgment appealed from, and order of the Appellate Division
brought up for review, affirmed, without costs, in a memorandum.
Chief Judge DiFiore and Judges Rivera, Stein, Fahey, Garcia and
Feinman concur.  Judge Wilson dissents in an opinion.

Decided October 24, 2017